Jeffrey L. Silvestrini (Bar No. 2959)
Cohne Kinghorn, P.C.
111 E. Broadway, 11th Floor
Salt Lake City, UT 84111
(801) 363-4300

Steven B. Singer *(pro hac vice to be filed)*
Saxena White P.A.
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611

Joseph E. White, III *(pro hac vice)*
Lester R. Hooker *(pro hac vice)*
Jorge A. Amador *(pro hac vice to be filed)*
Dianne M. Anderson *(pro hac vice to be filed)*
Saxena White P.A.
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
(561) 394-3399

Richard A. Maniskas *(pro hac vice to be filed)*
RM Law P.C.
1055 Westlakes Dr., Suite 3112
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile:  (484) 631-1305

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MELANIE DAVIS, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br>v.<br><br>SKULLCANDY, INC., SETH DARLING, JASON HODELL, and RICHARD P. ALDEN<br><br>      Defendants. | Case No. 2:16-cv-00121-RJS-PMW<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge Robert J. Shelby<br>Magistrate Judge Paul M. Warner |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

I.      SYNOPSIS OF THE FRAUD ........................................................................2

II.     JURISDICTION AND VENUE ......................................................................6

III.    THE PARTIES.................................................................................................7

        A.      Lead Plaintiffs.....................................................................................7

        B.      Defendants ...........................................................................................7

                1.      Skullcandy...............................................................................7

                2.      The Individual Defendants......................................................9

        C.      Relevant Non-Defendant Ptarmagin, LLC .......................................10

IV.     OVERVIEW OF THE SKULLCANDY FRAUD..........................................10

        A.      Background of Skullcandy.................................................................10

        B.      Leading Up to the Class Period, Skullcandy Faced Increased Competition
                Amidst Lackluster Financial Results .................................................11

        C.      Defendants Touted Skullcandy's International Growth and Increased Sales
                in China Throughout the Class Period While Aware of Chinese
                Distribution Issues ............................................................................13

        D.      Skullcandy China's Failing Business Model .....................................17

V.      THE TRUTH BEGINS TO EMERGE ..........................................................20

VI.     POST CLASS PERIOD EVENTS CONFIRM SKULLCANDY'S
        FRAUDULENT PRACTICES ......................................................................23

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS .................................................................................................27

        A.      First Quarter 2015.............................................................................28

        B.      Second Quarter 2015.........................................................................32

        C.      Third Quarter 2015 ...........................................................................34

VIII.   SKULLCANDY'S VIOLATIONS OF GAAP AND SEC REGULATIONS..................37

A.    Overview and Background of GAAP ...................................................37

B.    Defendants' Improper Accounting for Accounts Receivable ...............................39

C.    Defendants Failed to Disclose Known Trends or Uncertainties in Violation of SEC Regulations ...............................................42

IX.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .............................44

X.    LOSS CAUSATION.........................................................................................54

XI.    PRESUMPTION OF RELIANCE ....................................................................56

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .................................................................57

XIII.    CLASS ACTION ALLEGATIONS ..................................................................57

XIV.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT..............................................59

COUNT I ...............................................................................................59

COUNT II ..............................................................................................62

XV.    PRAYER FOR RELIEF ..................................................................................63

XVI.    JURY DEMAND ...........................................................................................64

## PRELIMINARY STATEMENT

Plaintiffs Marjorie B. Oswald and Margaret K. Peterson (together, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel. Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control. Lead Counsel's investigation included, among other things: (i) a review of public filings by Defendant Skullcandy, Inc. ("Skullcandy" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) presentations, press releases, media and analyst reports made by or about the Company; (iii) transcripts of Skullcandy's conference calls with analysts and investors; (iv) publicly available data relating to Skullcandy securities; (v) interviews with former employees of the Company; and (vi) other materials and data concerning the Company. Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant Skullcandy and the Individual Defendants Seth "Hoby" Darling ("Darling"), Jason Hodell ("Hodell") and Richard P. "Rick" Alden ("Alden"), and under Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired Skullcandy securities between May 5, 2015 through January 11, 2016 (the "Class Period").

1

I.      **SYNOPSIS OF THE FRAUD**

1.      This is a securities class action against Skullcandy, a designer, marketer and distributer of audio and gaming headphones, earbuds, speakers and other accessories.  In the years leading up to the Class Period, Skullcandy faced a growing number of competitors that significantly eroded the Company's market share.  While Skullcandy was once known as an innovative headphone company featuring trendy designs that were "all the rage with skateboarders and indie music fans," its brand was quickly becoming "irrelevant to its target market of 'irreverent youth,'" ushering in "a downward spiral."  In July 2011, Skullcandy completed its IPO at $20.00 per share, raising $188 million in a solid debut.  However, a mere year and a half later, Skullcandy was a takeover target after its stock price steadily declined by approximately 66%—a fall that was "more than almost every other initial public offering during the past 18 months."

2.      In order to stem the downward trajectory of Skullcandy's operations and bolster its attractiveness as an investment, Defendants engaged in a simple and straightforward fraud. Defendants repeatedly trumpeted Skullcandy's international business growth and prospects, emphasizing management's stated goal of foreign sales representing 50% of the Company's business.  Central to that growth was the Company's efforts in China, which Defendants repeatedly highlighted to investors during the Class Period.   Thus, Defendants bolstered Skullcandy's public perception and financial metrics by falsely representing that the Company was well-positioned to capitalize on its Chinese sales growth and that such growth would contribute an increasingly large percentage of the Company's future financial results.

3.      To that end, in the first quarter 2015, Skullcandy announced financial results touting first quarter net sales growth of 18% on a year-over-year basis, attributing growth to

"increased sales in China."[1]  Skullcandy's CFO Jason Hodell emphasized that "[t]he increase was primarily due to strong gains in China…."  Further, Skullcandy's CEO Hoby Darling highlighted the strength of the Company's China business and its importance to Skullcandy's financial growth: "[o]f all our regions, China grew at the fastest pace in the first quarter, up 36% year-over-year."  Similarly, in the second quarter 2015, the Company announced operating income and earnings per share that "exceed[ed] expectations," and raised guidance for full year earnings per share.  The Company's strong results were once again attributable to China as "[i]nternational net sales [] increased primarily due to increased sales in China."  Skullcandy's stock price increased on this news by $0.68 cents, or 9.32%, to $7.98 per share.  Accordingly, Defendants publicly touted gains in China as indicative of Skullcandy's focus on this region and its central role in the Company's operations and growth strategy.

4.      Analysts took note of Defendants' expansion in China, attributing the Company's strong overall results to its business in this region.  For instance, Sterne Agee | CRT, stated in its May 6, 2015 report that the Company's international sales were "driven by strength in China."  Roth Capital Partners, in its August 7, 2015 "SKUL: An Encouraging Outlook" report, highlighted the Company's "expansion in Asia," adding that Skullcandy had "gross margin expansion in 4Q15 to reflect strong anticipated growth of earbuds in China."  Further, in an August 7, 2015 report, Morgan Stanley noted that a "turnaround continues" at Skullcandy and that "headphone and earbud sales growth coming from…China," was a "key value driver."

5.      However, in reality, Skullcandy's financial results in China were not sustainable and were plagued by significant distribution problems.  In fact, Skullcandy sent its major distributor in China, Timesrunner, more of the Company's products than Timesrunner could

---

[1] Unless otherwise noted, all emphasis is added.

reasonably sell, which product merely sat in Timesrunner warehouses in China, threatening sales for the future.  In so doing, Defendants artificially inflated Skullcandy's financial results in China and concealed declining demand.  In other words, Defendants engaged in "channel stuffing," a deceptive business practice used by a company to inflate its sales and earnings figures by deliberately sending distributors more product than they are able to sell to the public, with the result of shifting earnings into earlier quarters to the detriment of earnings in later quarters.

6.     As confirmed by a former Skullcandy Area Sales Supervisor in Shanghai, in 2015, "we (prodded) our dealer to purchase our products, but the dealer cannot sell the products to the customers" because the demand simply was not there.  Accordingly, faced with a challenging business landscape and a recovery plan that required Skullcandy to continue to report increasing results in its Chinese market, Defendants resorted to illicit channel stuffing to falsely portray the Company's business prospects in a positive light.  Defendants provided excess supply to Timesrunner in order to create a misleading impression in the market of the Company's financial health.

7.     The truth began to emerge on November 5, 2015, when the Company announced third quarter results in which Defendants reduced EPS guidance to $0.37-$0.39 cents for the full year 2015, compared to previous guidance of between $0.41 and $0.43.  During the Q3 2015 earnings call on the same day, Defendants Darling and Hodell stated that distributor issues in China would affect Skullcandy's financial results.  In response to this news, the Company's stock price plummeted $1.53 per share, or 24%, from $6.34 per share to $4.81 per share.  However, despite this partial disclosure, Defendants continued to tout Skullcandy's international prospects, with Defendants falsely assuring investors that the blip was mere

4

temporary "<u>growing pains</u>" and that China remained a "<u>huge opportunity for the brand long-</u><u>term.</u>"

8.      Two months later, on January 11, 2016, Defendants fully disclosed the truth regarding the Company's true business prospects.  On this date, the Company announced that it had missed Q4 2015 net sales and earnings projections and slashed guidance to $0.20-$0.22, compared to its previous outlook of $0.38-$0.40.  The new outlook included a $1.6 million pre-tax charge for bad debt as a result of "<u>challenges with a China distributor.</u>"  Notably, Defendants were forced to take the reserve because Skullcandy's largest China distributor was returning product that the Company had previously booked as "sales" and now had to reverse those sales. Further, Defendants stated that had the bad debt charge not occurred, fourth quarter diluted earnings per share was expected to be between $0.25 and $0.27, five cents more.  The Company also admitted that net sales would be flat versus previous forecasts of a 5-7% increase in net sales due to "<u>2015 Q4 bad-debt allowance for [Skullcandy's] China distributor.</u>"  As stated by Defendant Darling, the Company had "<u>clean-up work with our largest China distributor.</u>"

9.      Analysts and investors were stunned.  Roth Capital Partners lowered its price target for Skullcandy from $10 to $5.50 in its January 12, 2016 report, stating that Skullcandy's "<u>shortfall stems from much weaker-than-anticipated 4Q15 sales…and a $0.05/share bad debt</u> <u>charge related to further challenges with a China distributor.</u>"  Wunderlich also highlighted the $0.05 per share charge related to the allowance for bad debt.  On this news, Skullcandy's shares dropped $1.29 per share, or more than 28%, from $4.55 on January 11, 2016 to close at $3.26 per share on January 12, 2016, on unusually heavy volume.

10.      Post-Class Period events confirmed the extent of the previously-undisclosed problems in China.  On March 2, 2016, Defendants announced fourth quarter and year ended

December 31, 2015, in which international net sales for the fourth quarter decreased by 11% "primarily due to decreased sales of gaming and audio products" in China.  During the earnings call on March 2, 2016, Defendant Darling noted the "significant impact" of the $1.6 million debt charge and "headwinds" and "challenges around payment and maximizing the territory" in China.  Darling explained that the Company's "wholesale business in China declined during the fourth quarter, as we withheld shipments to Timesrunner, our distributor that sells into the brick and mortar CE channel."

11.     These problems continued into 2016, with the Company reporting significant decreases in financial results in its May 2016 earnings announcement "primarily due to continued clean-up in China."  As late as August 2016, seven months after end of the Class Period, the Company still could not clear the channel or sell product in China.  Skullcandy disclosed that net international sales decreased 10% "primarily due to significantly decreased sales in China."  Significantly the Company said it was "continu[ing] to clean up" the channels.

12.     Then, on August 24, 2016, less than one year after Defendants characterized Skullcandy's China issues as temporary and mere "growing pains," the Company was sold to an affiliate of Mill Road Capital Management LLC.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  A substantial portion of the acts in furtherance of the

alleged fraud, including the effects of the fraud, have occurred in this Judicial District.   In addition, the Company's principal executive offices are located within this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   <u>THE PARTIES</u>

### A.     <u>Lead Plaintiffs</u>

16.     Plaintiff Marjorie B. Oswald, as set forth in Ms. Oswald's previously-filed certification incorporated herein by reference (*see* ECF No. 35-1), purchased Skullcandy common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On February 24, 2017, the Court appointed Marjorie B. Oswald as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B). ECF No. 37.

17.     Plaintiff Margaret K. Peterson, as set forth in Ms. Peterson's previously-filed certification incorporated herein by reference (*see* ECF No. 35-1), purchased Skullcandy common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On February 24, 2017, the Court appointed Margaret K. Peterson as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 37.

### B.     <u>Defendants</u>

#### 1.     <u>Skullcandy</u>

18.     Defendant Skullcandy is a Delaware corporation, with its principal executive offices located at 1441 West Ute Blvd., Suite 250, Park City, UT 84098.  The Company was founded in 2003 and began trading publicly in 2011.  Skullcandy offers audio and gaming

headphones, earbuds, speakers, sports performance products, women's offerings, and other audio accessories. Skullcandy touted that it "creates world-class audio experiences through its Skullcandy® and Astro Gaming® brands."  Throughout the Class Period, Skullcandy common stock traded on the NASDAQ Global Market ("NASDAQ"), where its stock was publicly traded under the symbol "SKUL."  As of October 31, 2015, there were 28,530,493 shares of Skullcandy common stock outstanding.

19.    On August 24, 2016, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement"), with MRSK Hold Co., a Delaware corporation ("Parent"), and MRSL Merger Co., a Delaware corporation and a direct wholly owned subsidiary of Parent ("Merger Sub").[2] Pursuant to the Merger Agreement, on September 1, 2016, Merger Sub commenced a tender offer to purchase all of the outstanding shares of common stock, upon the terms and subject to the conditions set forth in the Offer to Purchase dated September 1, 2016 and in the related Letter of Transmittal (which, together with the Offer to Purchase, constitute the "Offer").  On October 3, 2016, pursuant to the terms of the Merger Agreement, Merger Sub was merged with and into the Company, with the Company being the surviving corporation (the "Merger"). Upon completion of the Merger, the Company became a wholly owned subsidiary of Parent.

20.    In connection with the closing of the Merger, the Company notified The NASDAQ Stock Market LLC on October 3, 2016 that the Merger was consummated, and trading of the common stock of the Company on The NASDAQ Global Market had been suspended. Accordingly, The NASDAQ Stock Market LLC filed a notification of delisting of the

---

[2] As stated in the Company's October 3, 2016 press release, Skullcandy merged with "an affiliate of Mill Road Capital Management LLC."

Company's common stock from The NASDAQ Global Market and deregistration of the Company's common stock.

### 2.   The Individual Defendants

21.     Defendant Seth "Hoby" Darling was, at all relevant times, President, Chief Executive Officer ("CEO") and Director of Skullcandy.  Defendant Darling was appointed President and CEO at Skullcandy on March 18, 2013.  Defendant Darling served on the Company's Board of Directors until the Merger.  As stated by the Company in its October 3, 2016 Form 8-K, Defendant Darling resigned from his position as a member of the Company's Board of Directors, and any committee thereof "[i]n connection with the merger."  One week later, Defendant Hodell was announced to be Skullcandy's new CEO "effective immediately," effectively removing Darling from his previously held positions.[3]  During the Class Period, Defendant Darling made materially false and misleading statements and omissions during earnings calls, including on May 5, 2015, August 6, 2015, and November 5, 2015.  Defendant Darling also reviewed, approved, signed and certified Skullcandy's quarterly filings with the SEC on Forms 10-Q, including on May 8, 2015, August 7, 2015 and November 9, 2015, which contained materially false and misleading statements and omissions.

22.     Defendant Jason Hodell was, at all relevant times, Chief Financial Officer ("CFO") of Skullcandy.  Defendant Hodell's appointment as CFO was announced on October 7, 2013.  On November 5, 2015, Skullcandy appointed Hodell to the position of Chief Operating Officer.  After the Class Period and the Company's Merger, Defendant Hodell became Skullcandy's CEO, effective October 10, 2016.  During the Class Period, Defendant Hodell made materially false and misleading statements and omissions during earnings calls, including

---

[3] https://globenewswire.com/news-release/2016/10/10/878313/0/en/Skullcandy-Names-Jason-Hodell-as-Chief-Executive-Officer.html

on May 5, 2015, August 6, 2015, and November 5, 2015.  Defendant Hodell also reviewed, approved, signed and certified Skullcandy's quarterly filings filed with the SEC on Forms 10-Q, including on May 8, 2015, August 7, 2015 and November 9, 2015, which contained materially false and misleading statements and omissions.

23.     Defendant Richard P. "Rick" Alden was, at all relevant times, a member of Skullcandy's Board of Directors.  Alden founded the Company in January 2003 and served as its CEO until March 2011.  After Jeremy Andrus stepped down from his CEO position in February 2013, Alden was named Interim CEO, serving until Defendant Darling's appointment.  As stated by the Company in its October 3, 2016 Form 8-K, Defendant Alden resigned from his position as a member of the Company's Board of Directors, and any committee thereof "[i]n connection with the merger."

### C.     Relevant Non-Defendant Ptarmagin, LLC

24.     Relevant Non-Defendant Ptarmagin, LLC's only member is the Alden Irrevocable Trust, whose sole beneficiaries are the spouse and children of Defendant Rick Alden.  Defendant Alden exercises control over the Alden Irrevocable Trust, including its investments.

## IV.     OVERVIEW OF THE SKULLCANDY FRAUD

### A.     Background of Skullcandy

25.     Skullcandy was founded in Park City, Utah in 2003 by Defendant Alden. Skullcandy is a designer, marketer and distributer of audio and gaming headphones, earbuds, speakers and other accessories under the Skullcandy, Astro Gaming and 2XL brands. The Company offers an array of styles and price points and includes audio products and categories, such as sports performance, women's and wireless offerings, as well as partnerships with manufacturers to license its brand.  According to the Company's website, "Skullcandy came

screaming into this world as the brainchild of notorious non-conformer and action sports product mastermind Rick Alden."

26.     As stated by the Company in its 2014 Form 10-K, Skullcandy "pioneered the distribution of headphones and audio products in specialty retailers focused on action sports and the youth lifestyle with hundreds of independent snow, skate and surf retailers."  Skullcandy touted itself as a "global brand." The Company operated in two segments: Domestic and International.  The Domestic segment consisted of Skullcandy and Astro Gaming product sales to customers in the United States. International segment included Skullcandy product sales to customers in Europe, Asia, Canada and Mexico.

**B.     Leading Up to the Class Period, Skullcandy Faced Increased Competition Amidst Lackluster Financial Results**

27.     In the years leading up to the Class Period, Skullcandy faced a growing number of competitors that significantly eroded the Company's market share.  Although the Company had started out as an innovative headphone maker known for its colorful designs, evolving social tastes had rendered the Company "irrelevant to its target market of 'irreverent youth.'"[4] Skullcandy went from once being "all the rage with skateboarders and indie music fans" to "a downward spiral."[5]

28.     In July 2011, the Company went public at $20.00 per share, raising $188 million in a solid debut.[6]  But a mere year and a half later, Skullcandy was a "takeover target after 66% drop…after falling more than almost every other initial public offering during the past 18

---

[4] https://seekingalpha.com/article/2067573-after-an-epic-run-skullcandy-is-a-sell-ahead-of-earnings

[5] https://www.fastcompany.com/3049136/the-research-thats-driving-a-turnaround-at-skullcandy

[6] http://www.reuters.com/article/us-skullcandu-ipo-idUSTRE76I7GJ20110719

months."[7] *Bloomberg* noted in its January 9, 2013 article that "<u>Skullcandy has performed worse</u> <u>than all but seven of the 185 U.S. IPOs completed since its debut;</u>" that "increasing competition for in-ear headphones and the [C]ompany's move into lower-margin designs prompted [a] Jefferies downgrade;" Beats Electronics LLC's Beats by Dr. Dre brand was taking more market share than anticipated; and the Company faced a competitive threat from Apple, which bundles the devices with iPhones.

29.     In March 2013, a *CNN Money* article entitled "Not sweet music: Skullcandy plunges 20%," stated that "<u>Skullcandy's stock is getting crushed on a poor outlook.</u>"[8] The article cautioned that "<u>[t]he skull and crossbones image is often used to warn people something is</u> <u>poisonous. It might be needed to warn investors to steer clear of Skullcandy (SKUL) stock</u>."

30.     In addition to competitors flooding the market with lookalike products, Skullcandy faced retailer and marketing issues.  As described in *Seeking Alpha's* March 4, 2014 article, "After An Epic Run, Skullcandy Is A Sell Ahead of Earnings," Skullcandy was facing massive problems as the stores which carried the Company's products were closing or having sales difficulties of their own.[9]  The article noted that 1,100 RadioShack stores were closing and there was cause to "worry not only about Q4 Skullcandy sales numbers, but Q1 2015 guidance and forward."  Additionally, Target, "Skullcandy's largest customer by far" had been experiencing sales difficulty of its own resulting from its widely publicized data breach.  Best Buy, another key customer, was also experiencing poor sales.  The article questioned: "[i]f guidance is based for the most part on the sales of these key retailers, and each one of them is

---

[7] https://www.bloomberg.com/news/articles/2013-01-09/skullcandy-turns-takeover-target-after-66-drop-real-m-a

[8] http://buzz.money.cnn.com/2013/03/08/skullcandy-stock/

[9] https://seekingalpha.com/article/2067573-after-an-epic-run-skullcandy-is-a-sell-ahead-of-earnings

experiencing epic times of hardship, where are the revenues going to come from?;" and further questioned if "international sales penetration in…China" could make up Skullcandy's shortfall.

31.     Accordingly, leading up to the start of the Class Period, Skullcandy was losing market share position due to mounting pressure from its competitors and lackluster financial performance.  Defendants were thus faced with a challenging operational climate within which to stave off increased external competition.   In response, Defendants resorted to touting and manipulating Skullcandy's China sales and prospects in order to bolster the Company's financial results and business outlook.

**C.     Defendants Touted Skullcandy's International Growth and Increased Sales in China Throughout the Class Period While Aware of Chinese Distribution Issues**

32.     Prior to the start of the Class Period, Defendant Darling revealed Skullcandy's five pillar strategy to return to growth, which included: (1) marketplace transformation; (2) create the innovation future; (3) grow international to reach 50% of the Company's business; (4) expand and amplify categories and partnerships, and (5) team and operational excellence.   In particular, significant China growth was critical to increasing Skullcandy's international results.

33.     FE[10] 1, a former Global Demand Planning Manager at Skullcandy,[11] confirmed Defendants' focus on international operations and sales growth.   "They were trying to get

---

[10] Former Skullcandy employees are referred to herein as "FE __" and are referenced in the feminine form to maintain their confidentiality.

[11] FE 1 worked at Skullcandy from October 2011 through May 2015 at the Company's headquarters in Park City, Utah.  From October 2011 through December 2013, FE 1 was a Demand Planner, initially responsible for all demand forecasting in the high-growth international markets. As a Demand Planner, she developed a uniform process with the International Operations Manager to be able to analyze and aggregate demand across sales channels. She would also manage transition plans and operating analysis out of distributors and direct sales expansions in Europe, China, Japan, Canada, and Mexico. She also trained and supervised regional planners.  As a Global Demand Planning manager from January 2014 through May 2015, FE 1 oversaw demand forecasting and planning for the entire global business of the

international to be 50 percent of the revenue.  Everything I remember was that it was an aggressive goal, but there was short-term performance that made (it appear achievable)."  FE 1 added, "I remember the budget for 2015 was aggressive.  We (the supply and demand planning team) had presented a range and it was locked on the high side of that range.  For Skullcandy as a budget, it was definitely on the higher-growth side for all global."  FE 1 recollected in late 2014 telling Brent Phillips, Skullcandy Director of Supply Chain, "[w]ow, they're really going for it."  In a separate conversation also in late 2014, FE 1 remarked to President and CEO Hoby Darling and David Raffone, Skullcandy's Chief Revenue and Sales Officer, "[h]ey, you're going to be asking a lot from your sales teams" in order to hit 2015 goals.

34.     Thus, prior to and during the Class Period, Defendants touted substantial growth in its International Segment, which relied in large part upon increased sales in China, all while failing to acknowledge the tenuous and unreliable nature of such growth prospects.[12]  Defendants fraudulently engaged in channel stuffing, creating the false appearance of demand for the Company's product in China, when in reality those sales were due to oversupplying to its main distributor.

35.     On May 5, 2015, the start of the Class Period, Skullcandy issued a press release announcing encouraging financial results for the first quarter ended March 31, 2015, and touting first quarter net sales growth of 18% on a year-over-year basis.  In regards to total net sales, Skullcandy partially attributed that growth to "increased sales in China."  Skullcandy further forecasted that full year 2015 net sales would increase 13-15% over 2014 levels.

---

Skullcandy, 2XL, and Astrogaming brands. FE 1 also managed requirements for six different entities/subsidiaries across the world and numerous distribution partnerships in emerging markets.

[12] Indeed, for the six months ended June 30, 2015, international sales accounted for over 30% of total sales – a 16% increase over the same period in 2014.

36.   Moreover, during the Company's May 5, 2015 Q1 2015 earnings conference call, Defendant Hodell touted Skullcandy's international net sales increase, stating that "[t]he increase was primarily due to strong gains in China…"

37.   Further, in regards to China, Darling emphasized the strength of the Company's business in that region and its importance to Skullcandy's financial growth.  Defendant Darling stated that "[o]f all our regions, China grew at the fastest pace in the first quarter, up 36% year-over-year."  Describing China's "strong gains," Defendant Darling added that "China represents a huge opportunity for the brand. Consumers are responding very positively to our new product introductions, while at the same time we're building strong connections with our target audience through participation in grassroots events across sports, music, fashion and gaming."

38.   Analysts reiterated those statements and touted Skullcandy's China business.  For instance, Sterne Agee | CRT, stated in its May 6, 2015 report that the Company's international sales were "driven by strength in China."  Wunderlich noted in its May 6, 2015 report that "International [was] up 26%," and "expansion in Asia…drove [that] international growth."

39.   On August 6, 2015, the Company released its Q2 2015 financial results in a press release entitled "Skullcandy Second Quarter Operating Income and Earnings Per Share Exceed Expectations; Raises Guidance for Full Year Earnings Per Share."  Therein, the Company raised full year 2015 EPS guidance to between $0.41 and $0.43, an increase from its previous guidance of $0.36 and $0.40.[13]   Additionally, the Company announced that international net sales increased 16% due in part to increased sales in China.

40.   During the Company's August 6, 2015 Q2 2015 earnings conference call, Defendant Darling stressed Skullcandy's "significant opportunity to be in line with leading

---

[13] The Company issued this increased guidance at a time when certain insiders were poised to capitalize on the expected increase in its stock price, as discussed in greater detail below.

global brands and grow [] international business to approximately 50% of [] overall revenue over the long term."  Defendant Darling added that "[d]uring Q2, international continued to contribute a higher percentage of overall revenue compared to last year" and "<u>strong growth performance</u>" attributable to China.  Likewise, Defendant Hodell touted how "[i]nternational net sales increased 16% to $16.7 million from $14.4 million one year ago.  <u>The increase was primarily due to strong gains in …China</u>."[14]

41.    On this news, shares of Skullcandy increased $0.68 per share, approximately 9.32%, to close at $7.98 per share on August 7, 2015, on unusually heavy volume.

42.    Defendants' representations had the intended effect, as the market responded favorably to Skullcandy's purported international growth prospects.  For instance, Roth Capital Partners, in its August 7, 2015 "SKUL: An Encouraging Outlook" report, highlighted the Company's "<u>expansion in Asia</u>," adding that Skullcandy had "gross margin expansion in 4Q15 to reflect <u>strong anticipated growth of earbuds in China</u>."  Further, an August 7, 2015 Morgan Stanley report noted that Skullcandy's "turnaround continues" and that "<u>headphone and earbud sales growth coming from…China</u>," was a "<u>key value driver</u>."  Morgan Stanley concluded that the Company's "international growth story should continue beyond our last explicitly forecasted period (FY19)."

43.    Accordingly, throughout the Class Period, Defendants went out of their way to promote increasingly optimistic financial expectations in China, which they knew were materially false and misleading.  Defendants created the short-term illusion of increased demand for Skullcandy's products in China, so that their statements about sales, earnings, Skullcandy's

---

[14]  Defendant Hodell also stated during the Q2 2015 earnings call that "[b]ecause of [Skullcandy's]…<u>distributors, we are confident we can achieve our vision of being the global audio leader, deliver profitable growth and increase shareholder value</u>."

financial condition, and future earnings were materially false or misleading.  Defendants failed to disclose problems with its Chinese distributor and issued statements that, as shown below, allowed Skullcandy's founder to reap $4 million through illicit insider sales.

### D.      Skullcandy China's Failing Business Model

44.      In order to stoke investor expectations concerning Skullcandy's international business prospects, Defendants engaged in channel stuffing—fraudulently coordinating with its key distributor in China, Timesrunner, to take product the distributor did not want and could not sell, thus padding the Company's financial results.   As high-ranking former Skullcandy employees confirm, throughout the Class Period, Defendants were well-aware that Skullcandy was facing formidable hurdles to achieve the growth in the Company's China sales that had helped to fuel its increasing financial results.  Specifically, the Company's insiders knew of or recklessly disregarded that Skullcandy's Chinese market was facing significant challenges due to decreased customer demand and that distributors were hoarding product in warehouses as early as May 2015.

45.      For example, FE 2[15], a former Area Sales Supervisor in Shanghai expressed that the Company debuted its products in China in 2012 and experienced good sales in the first couple of years until 2015, when Defendants notably touted Skullcandy China's "strong gains," how it purportedly "grew at the fastest pace" and represented "a huge opportunity for the brand." FE 2 noted: "In the third year, [business was] not good because our dealer cannot sell product to

---

[15] From March 2012 through May 2015, FE 2 served as an Area Sales Supervisor in Shanghai. Her responsibilities included planning and delivering monthly and annual sales targets (retail and wholesale), managing the budget, activity and advertising, allocated to the area in the best possible manner to ensure highest possible impact in achieved per dollar spent, ensuring the quality and quantity of dealer activities to achieve the required results, developing and maintaining strong relations with key suppliers, monitoring and maintaining targeted stock levels, and coordinating with marketing, planning and distribution and network.

customers." FE 2 referenced that the dealer had significant amounts of unsold product stored in its warehouses, stating: "[o]ur dealer could not sell goods in the third year" and as a result the China market was "not good."

46.     In addition to causing the Company's distributor to take on product and hoard it in its warehouses, FE 2 further stated that sales in China declined due to poor marketing and public relations efforts. "Our marketing [was] not good," she remarked, adding that the marketing did "not work good in China." FE 2 stated that, in 2015, "We (prodded) our dealer to purchase our products, but the dealer cannot sell the products to the customers."

47.     A former Skullcandy Warehousing & Logistics Manager, FE 3[16] concurred that sales in China were not as strong as Defendants made it seem. In terms of how sales were trending in China during her tenure, FE 3 said "I definitely wouldn't say they were robust. It seemed like they were pretty flat. My impression of sales in China is that we really weren't gaining traction within the market."

48.     FE 1, a former Global Demand Planning Manager, travelled from Skullcandy's Park City, Utah headquarters to Shanghai in approximately August-September 2014 to work with Jay Li, Skullcandy's General Manager in China, on forecasting and planning for the 2015

---

[16] From December 2008 through November 2015, FE 3 worked at Skullcandy's headquarters in Park City, Utah in various positions. From December 2008 through July 2010, FE 3 worked in Supply Chain/Dealer Services, where her responsibilities included creating and distributing all vendor purchase orders in SAP ByDesign; and using SAP ByDesign, inputting and releasing sales orders for order fulfillment. From July 2010 through May 2013, she was an Inventory Control Analyst where her responsibilities included processing inbound warehouse receipts; implementing global cycle count processes; improving global inventory accuracy; and monitoring inventory velocity and driving aging inventory reduction. From May 2013 through November 2015, she was a Warehousing & Logistics Manager where she was the primary contact for all logistics operations at Skullcandy. She negotiated transportation and warehousing contracts; managed the process control, inventory management, and transportation for five warehouses globally; and worked cross-functionally with the finance team to analyze, improve, and control month, quarter, and year end close processes to Sarbanes-Oxley protocols.

calendar-year budget.  During this timeframe, FE 1 stated that "[t]he office was kind of in the growth stage of a distribution.  Everyone was just very sales driven."

49.    FE 1 noted Skullcandy's shift from issuing positive guidance in Q2 2015 to partially retracting this in Q3 2015, then to announcing in January 2016 a miss in net sales projections and a $1.6 million bad debt charge.  FE 1 remarked that this shift is evidence, at a very minimum, that "something was disconnected between sell through to the customer."  FE 1 added, "It could be cooking the books, it could be a misstatement."  FE 1 further remarked that, if there was a disconnect between the Company and the channels in China, such a disconnect suggests a lack of internal controls and oversight to an "extreme" level and a total lack of alignment with the distributor.   "That's one of those things where at the local market, theoretically, they (Skullcandy) should know that….A collapse like that…it was a red flag because no one was paying attention."

50.    At least as early as May 2015, the consumer demand for Skullcandy's products in China crashed.  In a May 15, 2015 industry roundtable discussion in Shanghai, reported in a *Campaign Asia* article on June 2, 2015,[17] Director of Marketing and Communications at Skullcandy in China, Vivian Tu, "revealed that consumers who are really into headphone performance are not buying Skullcandy as such, brands like Bose were not her competition. Skullcandy's appeal was more as a fashion product, deriving from popularity in 'skater culture.'" "Tu asserted that this is not sustainable."  Thus, even Skullcandy's Director of Marketing in China could attest that sales were not sustainable in China and that China would not lead to the growth that the Company desperately desired.

---

[17] Campaign Asia 34, "Is marketing focused on the right goals? The industry's obsession with measuring ROI may have distracted marketers from selling to the consumer, writes Jenny Chan," 2015 WLNR 39262573 (June 2, 2015).

51.     Moreover, as of year-end 2015, Skullcandy had no established email marketing campaign and had not made digital sales efforts in China.  Further, Skullcandy's Chinese website operated on an old platform and wasn't actively managed.  According to FE 4[18], Skullcandy's former Email Marketing and Database Manager, the online and digital sales push internationally was limited to Europe.  "I can tell you that <u>we never tried to do anything with the China market in 2015</u>.  Skullcandy performed no email marketing in China.  The international markets that we were attempting to get sales from were mostly European; in fact, nothing outside of Europe.  We were not doing any digital effort in China while I worked there." FE 4 recounted that "[i]n 2015, that Chinese website wasn't really a priority for us.  It wasn't anything that was a huge priority of ours."[19]

## V.     THE TRUTH BEGINS TO EMERGE

52.     After the close of the financial markets, on November 5, 2015, the Company announced third quarter results and lowered revenue and earnings guidance.  Specifically, Defendants reduced EPS guidance to $0.37-$0.39 cents for the full year 2015 compared to previous guidance of between $0.41 and $0.43.

---

[18] From October 2014 through January 2016, FE 4 worked at Skullcandy's corporate office in Park City, Utah as an Email Marketing and Database Manager.  FE 4's main focus was to email customers both domestically and overseas to capture increased online sales.   FE4's supervisor reported directly to Defendant Darling.

[19] FE 4 compared a website platform to a house's foundation.  "Every website is built off a foundation, and then the foundation allows the website to have certain sophistications.  Our new platforms, our new foundations for our website were enabling a lot more sophistication, including data analysis, shopping carts, optimization, things like that."  Initially, "we had an old platform that all of our websites that were run on that didn't provide those sophistications," she said.  When FE 4 started at Skullcandy in October 2014, the Company was moving its U.S. website to a new platform, followed by Canada and Europe.  Other regions followed in 2015, with the exception of China.  "China was a goal in 2016, but it was never a focus during 2015," FE 4 said.

53.     During the Q3 2015 earnings call on the same day, Defendant Darling described how distributor issues would affect Skullcandy's financial results, characterizing it as mere "growing pains," while failing to mention the magnitude of the issues with the Company's operations in China, instead stressing that China presented a "huge opportunity for the brand long-term" and that the problems in the region were "short term in nature and not a reflection of brand health":

> With international, these are growing pains and we're taking some of the lumps in order to put us in a place where longer term we can increase excitement for our brand, be closer to our consumer, increase gross margins and see higher sales growth.
>
> * * *
>
> China represents a huge opportunity for the brand long-term. Consumers are responding very positively to our new product introductions, and where we are direct with the consumer, we're seeing tremendous results. . . . we are decreasing our business with some CE distributors in order to get ahead of this trend and make sure we look good at retail, which will negatively impact Q4 and early 2016 results, but better position us for growth in the back half of 2016 and beyond.
>
> * * *
>
> The growing pains we're experiencing in China and parts of Europe are short term in nature and not a reflection of brand health.

54.     Defendant Hodell, in addition to discussing that international sales increases were "primarily due to strong growth in…China," also provided updated guidance for the full year and fourth quarter of 2015 during the call, stating that "international sales will be tempered due to…slower-than-expected growth and distributor transitions in Europe and China."

55.     Defendants minimized the situation as being merely a "transition period" and the "China situation" would only cause growth to be "down a little bit."  Defendant Darling conceded that sales were slowing in China, but falsely assured investors that the problems were temporary and that Skullcandy would "make the changes and really start accelerating."

21

56.     On this news, shares of Skullcandy decreased $1.53 per share, more than 24%, to close at $4.81 per share on November 6, 2015, on unusually heavy volume.  Despite this partial disclosure, the Company's common stock remained inflated due to Defendants' failure to fully disclose the issues plaguing the Company's business operations, including challenges with its China distributor, related to the collectability of receivables and inventory overhang that the Company was experiencing.

57.     Two months later, on January 11, 2016, Defendants fully disclosed the truth regarding the Company's true business prospects.  On this date, the Company announced that it had missed Q4 2015 net sales and earnings projections and slashed guidance to $0.20-$0.22, compared to its previous outlook of $0.38-$0.40.  The Company also admitted that net sales were to be flat for 4Q 2015 with 2014 levels versus previous forecasts of a 5-7% increase in net sales due to "2015 Q4 bad-debt allowance for [Skullcandy's] China distributor."

58.     As Defendant Darling stated, Skullcandy "chose to minimize sales to discount channels to further protect the Skullcandy brand and our retailers, as well as continue the clean-up work with our largest China distributor during the fourth quarter, as we shift to a more direct model in China."  The new outlook included a $1.6 million pre-tax charge for bad debt as a result of "challenges with a China distributor."  Defendants took the bad debt charge because Skullcandy's largest China distributor was returning product that the Company had previously booked as "sales" and now had to reverse those sales.

59.     Specifically, Defendants stated that had the bad debt charge not occurred, fourth quarter diluted earnings per share was expected to be between $0.25 and $0.27, not the stated $0.20-$0.22.  In other words, the bad debt charge was attributable to a material loss of five cents per share, or a 20% drop of quarterly diluted earnings per share.

60.    Analysts noted the extent of Skullcandy's financial issues related to China.  For instance, Roth Capital Partners' January 12, 2016 company update entitled "Estimates Changed, Target Price Changed," described the Company's shortfall and that "$0.05/share bad debt charge related to further challenges with a China distributor" contributed to it.

61.    In Wunderlich's January 12, 2016 analyst report entitled "Lowering Estimates and Price Target on Negative Preannouncement," Wunderlich reduced its price target for Skullcandy from $9.00 to $7.00.   Specifically, the report stated Wunderlich was reducing estimates on Skullcandy following the Company's negative preannouncement that it would miss 4Q guidance and that reduced 4Q guidance included a "$0.05 per share charge related to allowance for bad debt from a Chinese distributor; otherwise the new 4Q earnings outlook would have been $0.25-0.27."

62.    As a result of Skullcandy's full and belated disclosure of its issues in China and the effect it had on its financial state, shares of Skullcandy plummeted $1.29 per share, more than 28%, to close at $3.26 per share on January 12, 2016, on unusually heavy volume.

## VI.    POST CLASS PERIOD EVENTS CONFIRM SKULLCANDY'S FRAUDULENT PRACTICES

63.    Post Class Period events confirm how extensive the problems were in China.

64.    Two days after the truth was revealed, on January 13, 2016, the Company presented at the 2016 ICR Conference.  At the Conference, the Company noted that "Chinese distributor bad debt expense $1.6 million = $0.05" and that it needed to "fix China" in 2016.

65.    *The Motley Fool's* January 20, 2016 article entitled "Can Skullcandy Bounce Back From Last Week's 34% Drop? – The edgy audio-accessories maker takes a hit after updating its outlook for the holiday quarter," stated the following: "Add it all up, and Skullcandy is eyeing a profit of just $0.25 a share to $0.27 a share for the critical fourth quarter after backing

23

out a one-time charge related to a thorny issue with its largest Chinese distributor. That's a far
cry from where it was in November, forecasting as much as $0.40 a share in net income."[20]

66.     On March 2, 2016, Defendants announced fourth quarter and year ended
December 31, 2015 results, including full year 2015 EPS of $0.20, which was slashed from the
$0.41-$0.43 range the Company had originally forecasted.  For the fourth quarter 2015,
international net sales decreased 11% "primarily due to decreased sales of gaming and audio
products" in China.  Moreover, SG&A expenses increased 2% "primarily due to increased bad
debt expense of $1.6 million related to a China distributor."

67.     During the earnings call on March 2, 2016, Defendant Darling admitted that the
bad debt charge of $1.6 million at year-end "had a significant impact on our Q4 EPS."
Defendant Darling proffered that Skullcandy's international strength was "[o]ffset by headwinds
from certain distributor markets that are in transition, especially China where we continue to
have some challenges around payment and maximizing the territory."  Defendant Darling
explained that the Company's "wholesale business in China declined during the fourth quarter
and we withheld shipments to Timesrunner, our distributor that sells into the brick and mortar
CE channel."  "We needed to address their current inventory overhang and respond to payment
challenges," stressed Darling, who explained Skullcandy's need "to improve the situation…."

68.     Defendant Hodell reiterated that international sales fell due, in part, to changes
made in China and that "higher product returns" in China adversely impacted gross margin.
Hodell's discussion on Q1 guidance highlighted that the fallout from China was also going to
continue.  He stated that Defendants expected Q1 net revenue to change in a range of minus 4%

---

[20] https://www.fool.com/investing/general/2016/01/20/can-skullcandy-bounce-back-from-last-
weeks-34-drop.aspx

to flat versus the prior year due in part to China as "China revenue in the Q1 plan is $1.3 million less than Q1 2015."

69.     Remarkably, the issues that were once downplayed as mere "growing pains" further continued into 2016.  On May 4, 2016, the Company announced financial results for the first quarter 2016.  Yet again, international net sales decreased 3%, "<u>primarily due to continued clean-up in China</u>." In other words, as stated by Defendant Darling, Defendants continued to take "actions <u>to improve [the Company's] China wholesale position which unfortunately offset solid growth in several of [Skullcandy's] other overseas markets and negatively impacted earnings per share by $0.02 cents versus [the Company's] plan</u>."  Moreover, gross margin was 37.5%, down 340 basis points from 40.9% the prior year, primarily due to the "<u>fall in [Skullcandy's] year-over-year China sales operation's gross margin where [the Company] experienced large Q1 promotional credits and returns to aid in the continued cleanup of the China channel</u>."  The Company was still taking charges to offset excess inventory in China, and China was still materially affecting business.

70.     On May 5, 2016, *The Motley Fool* released an article entitled, "Skullcandy's Results Zapped by Trouble in China - Issues with the China sales operation reduced revenue growth and took a bite out of earnings," noting the "<u>significant issues with Skullcandy's China sales operation</u>."[21]  Moreover, the article added that "[t]rouble in China was mentioned during Skullcandy's fourth-quarter conference call back in March, with the [C]ompany stating that it <u>withheld shipments to a distributor due to inventory overhang and payment issues</u>."

71.     As late as August 2016, seven months after end of the Class Period, the Company still could not clear the channel or sell product in China.  Skullcandy disclosed that net

---

[21] https://www.fool.com/investing/general/2016/05/05/skullcandys-results-zapped-by-trouble-in-china.aspx

international sales decreased 10% "primarily due to <u>significantly decreased sales in China</u>" and gross profit decreased 4% also due to China.   Significantly, the Company said it was "<u>continu[ing] [to] clean up</u>" the channels.

72.     *The Motley Fool's* August 10, 2016 article entitled "Skullcandy Reports Sales Decline Ahead of Acquisition," highlighted that "the headphone company is struggling with…lower sales in China."   The article added that "[o]ngoing problems in China and retailer bankruptcies hurt Skullcandy's results" and that "[g]ross margin decreased 160 basis points to 41.1%, also <u>due to problems in China</u>."[22]   The article referenced Defendant Darling's discussion of "<u>the ongoing clean-up of our China region</u>."

73.     *SGB Media's* August 10, 2016 article entitled "Skullcandy Sinks into Red on Acquisition, Bankruptcy Charges," also noted the Company's issues in China, stating that "international sales slumped 10.2 percent to $15 million, primarily due to significantly decreased sales in China."[23]   The article also noted that Skullcandy's "bottom line was impacted by a decrease in gross percent in the latest quarter from 42.7 percent in the same quarter a year ago, <u>primarily due to continued clean-up in China</u>."

74.     Then, less than one year after Defendants said any slowdown in China was temporary, on October 3, 2016, the Company went private, with the stock being delisted, as Skullcandy was acquired by an affiliate of Mill Road Capital Management LLC. The further fallout from Skullcandy's Chinese fraud remains unknown.

---

[22]https://www.fool.com/investing/2016/08/10/skullcandy-reports-sales-decline-ahead-of-acquisit.aspx

[23] https://sgbonline.com/skullcandy-sinks-into-red-on-sale-bankruptcy-charge/

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

75.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, Skullcandy's press releases, investor conferences, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's business, operations and prospects.

76.    Contrary to Defendants' representations, Skullcandy was experiencing pronounced issues in its China business.  Defendants knew of, or at a minimum recklessly disregarded, that Skullcandy's team in China arranged for its local distributor to take on product regardless of declining demand and hoard it in warehouses beginning at least as early as May 2015 and continuing through at least the end of 2015.  In sum, Skullcandy engaged in channel stuffing, a deceptive business practice used by a company to inflate its sales and earnings figures by deliberately sending distributors more product than they are able to sell to the public.  By doing so, Defendants knew that sales would be materially impacted in future reporting periods, as the distributor would not be able to take additional product.  As stated by a former Skullcandy Area Sales Supervisor in Shanghai, in 2015, "[w]e (prodded) our dealer to purchase our products, but the dealer cannot sell the products to the customers."  Defendants knew of or recklessly disregarded the challenges concerning collectability of receivables and inventory overhang that the Company was experiencing with its China distributor.

77.    As a result of the foregoing, Defendants' statements about Skullcandy's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.  These material misstatements and omissions had the cause and effect of creating in the market an

27

unrealistically positive assessment of Skullcandy's business, operational status, and future growth prospects.

**A.** <u>**First Quarter 2015**</u>

78.     On the first day of the Class Period, May 5, 2015, Skullcandy issued a press release announcing encouraging financial results for the first quarter ended March 31, 2015. The Company touted "first quarter net sales growth of 18% on a year-over-year basis to $46.2 million from $39.1 million in the same quarter of the prior year" and "[i]nternational (Non U.S.) net sales increased 17% to $15.1 million from $13.0 million in the same quarter of the prior year." In regards to the increase in total net sales, Skullcandy partially attributed that growth to "<u>increased sales in China</u>."

79.     Also in the Q1 2015 earnings release, the Company forecasted that full year 2015 net sales would "increase 13-15% over 2014 levels," and reiterated its full year 2015 EPS guidance of "$0.36 to $0.40 per share."

80.     On May 5, 2015, the Company held its Q1 2015 earnings conference call. During the call, Defendant Hodell touted Skullcandy's international net sales increase and that China was attributable, stating the following: "<u>International net sales increased 17% to $15.1 million from $13 million one-year ago. The increase was primarily due to strong gains in China</u>…"

81.     Further, in regards to China, Darling emphasized the strength of the Company's business in that region and its importance to Skullcandy's financial growth, stating that, "Of all our regions, China grew at the fastest pace in the first quarter," and that "<u>China represents a huge opportunity for the brand</u>."

82.     On May 8, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended March 31, 2015. The Form 10-Q was signed by Defendants

Darling and Hodell, and reaffirmed the Company's financial results previously announced on May 5, 2015.  Specifically, Skullcandy again attributed its increase in international net sales to China: "Total net sales increased 18.2%, or 21.3% on a currency neutral basis, primarily due to increased sales of audio gaming products across both segments. International net sales also increased primarily due to increased sales in China…"

83.     Further, the Company's 1Q 2015 Form 10-Q and each of Skullcandy's subsequent quarterly reports filed with the SEC (as described herein) contained certifications signed by Defendants Darling and Hodell attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.  Specifically, the certifications included in Skullcandy's 1Q 2015 10-Q provided the following, in relevant part:

1. I have reviewed this quarterly report on Form 10-Q for Skullcandy, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

29

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles</u>;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. <u>All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting</u> which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

b. <u>Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.</u>[24]

84.    Additionally, each of Skullcandy's quarterly reports filed with the SEC (as described herein) contained certifications signed by Defendants Darling and Hodell pursuant to §906 of the Sarbanes-Oxley Act of 2002 ("SOX").  Specifically, the SOX certifications included in Skullcandy's 1Q 2015 10-Q provided the following, in relevant part:

I, [], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Skullcandy, Inc. for the quarter ended March 31, 2015 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and

---

[24] 1Q 2015 Form 10-Q at Ex. 31.1 and Ex. 31.2.  This statement was repeated in substantially similar form in the Company's filings throughout the Class Period, including in the following: 2Q 2015 Form 10-Q at Ex. 31.1 and Ex. 31.2; and 3Q 2015 Form 10-Q at Ex. 31.1 and Ex. 31.2.

that information contained in such report fairly presents, in all material respects, the financial condition and results of operations of Skullcandy, Inc.[25]

85.    Defendants' statements identified above in ¶¶78-84 were false and misleading, and omitted material facts when made.  Skullcandy had forced its key distributor in China, Timesrunner, to take product it did not want and could not sell.  Defendants engaged in channel stuffing to make its first quarter numbers.  Moreover, the demand for Skullcandy's products in China was not strong as Defendants had portrayed it to be.  By forcing its distributor to keep product, Defendants knew that sales would be materially impacted in future reporting periods, as the distributor would not be able to take additional product.  Thus, Defendants' 1Q 2015 results did not demonstrate "increased sales in China," and China did not represent "a huge opportunity for the brand."  Specifically, at the end of the Class Period, Skullcandy had to take a $1.6 million pre-tax charge for bad debt as a result of "challenges with a China distributor."

86.    Further, Defendants had no reasonable basis for the guidance provided and were aware of undisclosed facts which seriously undermined the validity of the statements made. Defendants knew the outlook for full year 2015 did not reflect the reality of the challenges related to the collectability of receivables and inventory overhang that the Company was experiencing with its China distributor.  The guidance issued was false because Defendants knew as a result of issues with China that it could not meet its reported full year 2015 net sales increase of 13-15% over 2014 levels, and full year 2015 EPS guidance of between $0.36 and $0.40.  In reality, as reported, full year 2015 net sales only increased 7% and EPS was only $0.20.

---

[25] 1Q 2015 Form 10-Q at Ex. 32.1.  This statement was repeated in substantially similar form in the Company's filings throughout the Class Period, including in the following: 2Q 2015 Form 10-Q at Ex. 32.1; and 3Q 2015 Form 10-Q at Ex. 32.1.

B.    **Second Quarter 2015**

87.    On August 6, 2015, Skullcandy issued a press release announcing financial results for the second quarter 2015.  The Company announced that "net sales in the second quarter of 2015 increased 8% to $58.0 million from $53.9 million in the same quarter of the prior year" and "[i]nternational (Non U.S.) net sales increased 16% to $16.7 million from $14.4 million in the same quarter of the prior year" due in part to "increased audio sales in…China."  Therein, the Company continued to forecast net sales to "increase 13-15% over 2014 levels" and raised full year 2015 EPS guidance to "$0.41 to $0.43 per share," an increase from its previous guidance of $0.36 and $0.40.

88.    During the Q2 2015 earnings call on August 6, 2015, in regards to international sales, Defendant Darling boasted how "sales outside of the U.S. [grew] 25% in constant currency" and China had a "strong growth performance[]."  Defendant Hodell reiterated that "International net sales increased 16% to $16.7 million from $14.4 million one year ago. The increase was primarily due to strong gains in…China….   On a constant-currency basis, international growth was 24% year-over-year."

89.    Also during the call, Defendant Hodell provided updated guidance for the full year, third quarter and fourth quarter of 2015.  In regards to full-year guidance, Defendant Hodell stated: "on revenue, we still expect net revenue to grow at 13% to 15% rate for full year 2015 versus 2014" and "based on our updated view of the second half, we are proud to raise our annual EPS guidance to a range of $0.41 to $0.43 from our previous guidance of $0.36 to $0.40. This mid-point point implies year-over-year growth of EPS 56% or 92% on a constant currency basis."  Defendant Hodell provided Q4 2015 guidance, stating: "in Q4, we are currently

forecasting net sales to increase 13% to 15% over 2014 levels, with growth led by our international segment" and "[w]e are expecting Q4 GAAP diluted EPS of $0.42 to $0.44."

90.     On August 7, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended June 30, 2015.  The Form 10-Q was signed and certified by Defendants Darling and Hodell, and reaffirmed the Company's financial results previously announced on August 6, 2015.

91.     Defendants' statements identified above in ¶¶87-90 were false and misleading, and omitted material facts when made.  Skullcandy had forced its key distributor in China, Timesrunner, to take product it did not want and could not sell.  Defendants engaged in channel stuffing to make its first quarter numbers. Moreover, the demand for Skullcandy's products in China was not strong as Defendants had portrayed it to be.  By forcing its distributor to keep product, Defendants knew that sales would be materially impacted in future reporting periods, as the distributor would not be able to take additional product.  Thus, Defendants' 2Q 2015 results did not demonstrate "strong gains" in China, and China did not have a "strong growth performance."  Specifically, at the end of the Class Period, Skullcandy had to take a $1.6 million pre-tax charge for bad debt as a result of "challenges with a China distributor."

92.     Further, Defendants had no reasonable basis for the guidance provided and were aware of undisclosed facts which seriously undermined the validity of the statements made. Defendants knew the outlook for the second half of 2015 did not reflect the reality of the challenges related to the collectability of receivables and inventory overhang that the Company was experiencing with its China distributor. The guidance issued was false because Defendants knew as a result of issues with China that it could not meet its reported full year 2015 net sales increase of 13-15% over 2014 levels, and full year 2015 EPS guidance of between $0.41 and

$0.43 and its 4Q guidance of 13-15% over 2014 levels and Q4 GAAP diluted EPS of $0.42 to $0.44.  In reality, as reported, full year 2015 net sales only increased 7% and EPS was only $0.20; and net sales in the fourth quarter of 2015 decreased 0.8% and diluted EPS was $0.21.

### C.     Third Quarter 2015

93.     On November 5, 2015, Skullcandy issued a press release entitled "Skullcandy Reports Third Quarter 16% Net Sales Growth," announcing third quarter 2015 results. The Company announced that "[n]et sales in the third quarter of 2015 increased 16% to $67.2 million from $58.1 million in the same quarter a year ago, or an increase of 19% on a currency neutral basis" and "International (Non U.S.) net sales increased 3% to $20.2 million from $19.5 million in the same quarter a year ago, or an increase of 14% on a currency neutral basis, <u>primarily due to increased audio product sales in…China</u>."

94.     The press release also updated the Company's full year 2015 and 4Q 2015 outlook:

> 2015 Full Year and Fourth Quarter Financial Outlook
>
> For the full year 2015, the Company forecasts net sales to increase 10-11% over 2014 levels, or approximately 13% on a constant currency basis, and net income on a U.S. GAAP fully-diluted per share basis of a range of $0.37 to $0.39, an increase of 42% over 2014 levels, or approximately 82% on a constant currency basis.
>
> For the fourth quarter of 2015, the Company forecasts net sales to increase 5-7% over 2014 levels, or approximately 9% on a constant currency basis, and net income on a U.S. GAAP fully-diluted per share basis of a range of $0.38 to $0.40, an increase of 49% over 2014 levels, or approximately 65% on a constant currency basis.

95.     During the Company's earnings call on November 5, 2015, Defendants continued to mask the Company's issues, failing to fully disclose the extent to which the Company's operations were suffering.  Therein, Defendant Darling touched upon how distributor issues

would affect Skullcandy's financial results, characterizing it as mere "growing pains," while failing to mention the magnitude of the issues with the Company's operations in China, instead stressing that China remained a "huge opportunity for the brand long-term":

> <u>With international, these are growing pains and we're taking some of the lumps in order to put us in a place where longer term we can increase excitement for our brand, be closer to our consumer, increase gross margins and see higher sales growth.</u> In these cases, we're doing the right thing for the brand even if it causes some short term pain.

96.     Defendant Darling further asserted: "In China, sales grew 29% on a reported basis and 32% on a currency neutral basis…" Defendant Darling further discussed Skullcandy's "huge opportunity" in China, and that "<u>[c]onsumers are responding very positively to our new product introductions, and where we are direct with the consumer, we're seeing tremendous results</u>…." Defendant Darling further explained that Skullcandy's growing pains "are short term in nature and not a reflection of brand health."

97.     Defendant Hodell, in addition to discussing that "international net sales increased 3% to $20.2 million from $19.5 million one year ago…primarily due to strong growth in…China," also reiterated the updated guidance for the full year and fourth quarter of 2015 mentioned in the Company's earnings release and stated that the Company was "targeting a Q4 gross margin in the range of 41.5% to 42.5% or 42.7% to 43.7% on a constant currency basis with an expected gross margin foreign currency drag of 120 basis points."

98.     On November 9, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended September 30, 2015. The Form 10-Q was signed and certified by Defendants Darling and Hodell, and reaffirmed the Company's financial results previously announced on November 5, 2015.

35

99.     On November 18, 2015, the Company presented at the Furey Hidden Gems Conference, where it discussed a "temporary slowdown in China," noted that Skullcandy would "transition[] to improved distribution platforms," and reiterated its prior guidance.

100.     Defendants' statements identified above in ¶¶93-99 were false and misleading, and omitted material facts when made.  Skullcandy had forced its key distributor in China, Timesrunner, to take product it did not want and could not sell.  Defendants engaged in channel stuffing to make its first quarter numbers.  Moreover, the demand for the product in China was not strong as Defendants had portrayed it to be.  By forcing its distributor to keep product, Defendants knew that sales would be materially impacted in future reporting periods, as the distributor would not be able to take additional product.  Thus, Defendants' 3Q 2015 results <u>did not</u> demonstrate strong sales in China, and China <u>was not</u> a "huge opportunity for the brand long term."  Specifically, at the end of the Class Period, Skullcandy had to take a $1.6 million pre-tax charge for bad debt as a result of "<u>challenges with a China distributor</u>."  Defendants had no reasonable basis to characterize its issues in China as being mere "growing pains," and "short term in nature and not reflective of brand health," as the issues in China continued past 3Q 2016 and potentially beyond, forcing the Company to go private.

101.     Further, Defendants had no reasonable basis for the guidance provided and knew of undisclosed facts that seriously undermined the validity of the statements made.  Defendants knew the outlook for the 4Q 2015 and FY 2015 did not reflect the reality of the challenges related to the collectability of receivables and inventory overhang that the Company was experiencing with its China distributor.  The guidance issued was false because Defendants knew as a result of issues with China that it could not meet its reported full year 2015 net sales increase of 10-11% over 2014 levels, and full year 2015 EPS guidance of between $0.37 and $0.39 and its

36

4Q guidance of 5-7% over 2014 levels and Q4 GAAP diluted EPS of $0.38 to $0.40.  In reality, as reported, full year 2015 net sales only increased 7% and EPS was only $0.20; and net sales in the fourth quarter of 2015 decreased 0.8% and diluted EPS was $0.21.

## VIII.  SKULLCANDY'S VIOLATIONS OF GAAP AND SEC REGULATIONS

### A.      Overview and Background of GAAP

102.    During the Class Period, Defendants represented that Skullcandy's financial statements were prepared in conformity with GAAP.  GAAP are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.  Skullcandy's Forms 10-Q during the Class Period were materially false and misleading because, among other things, they included financial statements that materially understated Skullcandy's bad debt and overstated Skullcandy's earnings, and accounts receivable.  Defendants caused the Company to violate GAAP and SEC rules by, among other things, improperly understating the Company's bad debt expense, and overstating the Company's accounts receivables and earnings.

103.    As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

104.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

105.    SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."[26]   Management is responsible for preparing financial statements that conform to GAAP.  As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility . . . .  [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . .   Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

106.    In order to meet earnings expectations, Defendants failed to disclose that they had pressured Skullcandy's China distributor, Timesrunner International to accept quantities of product exceeding its inventory needs and current demand.  Moreover, Defendants knew or recklessly disregarded the challenges concerning collectability of receivables and inventory overhang that the Company was experiencing with its China distributor.   Accordingly, Defendants caused the Company to violate GAAP and SEC rules by, among other things: overstating Skullcandy's earnings during the Class Period by approximately $1.6 million by failing to increase Skullcandy's allowance for doubtful accounts to account for uncollectible accounts receivable.

---

[26] 17 C.F.R. § 210.4-01(a)(1).

### B.   Defendants' Improper Accounting for Accounts Receivable

107.   Skullcandy's reported financial results during the Class Period were materially false and misleading because the Company overstated its accounts receivables due to improperly failing to record timely charges to earnings.  This enabled the Company to improperly understate its bad debt expense and thereby falsely inflate earnings.

108.   Accounts receivables "are reported at their net realizable value, which is the nondiscounted amount of cash, or its equivalent, into which an asset is expected to be converted in due course of business less direct costs, if any, necessary to make that conversion."[27]

109.   Further, under GAAP, impairment of receivables shall be recognized when, based on all available information, it is probable that a loss has been incurred based on past events and conditions existing at the date of the financial statements.[28]  ASC 450-20, *Loss Contingencies*, requires recognition of a loss when (1) information available before the financial statements are issued indicates that it is probable that an asset has been impaired at the date of the financial statements, and (2) the amount of the loss can be reasonably estimated.[29]  If, based on current information and events, it is probable that the entity will be unable to collect all amounts due according to the contractual terms of the receivable, a loss must be recognized.[30]  The conditions for accrual of a loss are not intended to be so rigid that they require virtual certainty before a loss is accrued.[31]  They require only that it be probable that an asset has been impaired or a liability

---

[27] *Concepts Statement* No. 5 ¶67d.

[28] ASC 310-10-35-4.

[29] ASC 310-10-35-8.

[30] ASC 310-10-35-10.

[31] ASC 310-10-35-19.

has been incurred and that the amount of loss be reasonably estimable.[32]  Probable does not mean virtually certain.[33]

110.    Defendants represented that they complied with GAAP in reporting the Company's accounts receivable.  For example, in the Company's 2014 Form 10-K, Defendants represented in pertinent part, the following:

Accounts Receivable

Throughout the year, we perform credit evaluations of our retailers and distributors, and we adjust credit limits based on payment history and the retailer's or distributor's current creditworthiness. We continuously monitor our collections, maintain credit insurance, and have an allowance for doubtful accounts based on our historical experience and any specific customer collection issues that have been identified. The Company records a specific reserve for individual accounts when the Company becomes aware of a customer's likely inability to meet its financial obligations, such as in the case of bankruptcy filings or deterioration in the customer's operating results or financial position. If circumstances related to customer change, the Company would further adjust estimates of the recoverability of receivables. Bad debt expense is reported as a component of selling, general and administrative expenses. Historically, our losses associated with uncollectible accounts have been consistent with our estimates, but there can be no assurance that we will continue to experience the same credit loss rates that we have experienced in the past. Unforeseen, material financial difficulties of our retailers or distributors could have an adverse impact on our profits.[34]

111.    According to the Company's 2014 Form 10-K:

Revenue Recognition and Sales Returns and Allowances

Net sales are recognized when title and risk of loss pass to the retailer or distributor and when collectability is reasonably assured. Generally, we extend credit to our retailers and distributors and do not require collateral. Our payment terms are typically net-30 with terms up to net-120+ for certain international customers. We recognize revenue net of estimated product returns and pricing adjustments.

---

[32] *Id.*

[33] *Id.*

[34] 2014 Form 10-K at 28 (Mar. 13, 2015).

112.    But Defendants failed to disclose that the Company improperly recorded revenues relating to sales to distributors when the company lacked the support necessary for revenue recognition.  Indeed, Defendants knew of recklessly disregarded that Skullcandy's team in China arranged for its local distributor to take on product regardless of declining demand and hoard it in warehouses beginning at least as early as May 2015 and continuing through at least the end of 2015.   In addition, Defendants knew of recklessly disregarded the challenges concerning collectability of receivables and inventory overhang that the Company was experiencing with its China distributors.  Accordingly, these were not legitimate receivables, as there was no prospect of collectability at the time they were recorded.

113.    On January 11, 2016, the Company issued a press release announcing an update for the fourth quarter ended December 31, 2015, which stated in pertinent part, that the "new outlook includes a $1.6 million pre-tax allowance for bad debt charge related to further challenges with a China distributor."  The press release also quoted Defendant Darling stating: "We also chose to minimize sales to discount channels to further protect the Skullcandy brand and our retailers, as well as continue the clean-up work with our largest China distributor during the fourth quarter, as we shift to a more direct model in China."

114.    The $1.6 million bad debt charge, doubled the Company's allowance for bad debt in 4Q 2015, after Defendants consistently lowered the allowance during the Class Period, despite challenges with the China distributor.



### C.     Defendants Failed to Disclose Known Trends or Uncertainties in Violation of SEC Regulations

115.     Defendants violated Item 303 of Regulation S-K, 17 C.F.R. §229.303, by providing incomplete and materially misleading disclosures in its 1Q 2015 through 3Q 2015 Forms 10-Q including challenges with its China distributors, related to the collectability of receivables and inventory overhang that the Company was experiencing

116.     The instructions to Item 303(a) state the following:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

117.     Additionally, Item 303 of Regulation S-K requires MD&A sections to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). SEC guidance on Item 303, also states that disclosure is necessary "where a trend, demand, commitment, event or uncertainty is both presently known to management and

reasonably likely to have material effects on the registrant's financial conditions or results of operations."[35]

118.    The Company's Forms 10-Q for the second and third quarters of 2015 disclosed that its SG&A expenses were positively impacted "by focus on cost control efforts and lower proportional amounts of payroll and bad debt."   The disclosures regarding bad debt were materially false and misleading because they omitted any reference to Skullcandy's difficulties with its China distributor and related collectability of its receivables.

119.    Nonetheless, Skullcandy's Class Period Forms 10-Q failed to disclose that the Company's revenue growth was, in part, achieved at the expense of future results.  Indeed, the Company had offered discounts and other inducements and pressures to customers to sell product immediately that otherwise would have been sold in later periods, each of which were all reasonably likely to have a material adverse effect on Skullcandy's operating results, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.  By failing to report the facts concerning its sales practices, the Class Period's Form 10-Qs failed to provide investors with the most basic information necessary to understand Skullcandy's financial results, mischaracterized the Company's earnings and operations and omitted material information.   In addition, Defendants failed to disclose existence of known trends, events or uncertainties that they reasonably expected would have a material unfavorable impact on Skullcandy's operating results in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303).

120.    Accordingly, Defendants' material misstatements and omissions throughout the Class Period had the cause and effect of creating in the market an unrealistically positive

---

[35] Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 33-6835.

assessment of Skullcandy and its business operations.  Such misrepresentations violated GAAP and SEC regulations outlined above.

## IX.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

121.    Numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts plaguing the Company's business operations, including challenges with its China distributor related to the collectability of receivables and inventory overhang that the Company was experiencing.

122.    *China was critical to the Company and management focused heavily on this region in its communications with investors*.  Skullcandy's international business, and China in particular, was critical to the Company to stem the downward trajectory of its business leading up to the start of the Class Period.  China represented a huge growth market and Defendants touted the significant opportunity that this region represented.  The Individual Defendants' spoke repeatedly about the Company's China growth throughout the Class Period.  *See e.g.* ¶¶35-37, 39-40, 53-54.  For example, Defendant Hodell touted that "[i]nternational net sales increased 16% to $16.7 million from $14.4 million one year ago.  The increase was primarily due to strong gains in …China."  ¶36.  Moreover, Defendant Darling emphasized that "[o]f all our regions, China grew at the fastest pace in the first quarter, up 36% year-over-year."  ¶37.

123.    Furthermore, the Individual Defendants were well aware of the fact that the market was relying on these statements, as analysts published reports that underscored the Company's China growth prospects.  *See* ¶¶38, 42.  The Individual Defendants knew, or were severely reckless in not knowing, that China was not producing the remarkable sales and growth about which they spoke so frequently.

124.     *Defendants knew or were severely reckless in not knowing about issues with its*
*main distributor in one of its main growth regions.*  Significantly, this is not a case where the
Company used multiples of distributors, and can claim that it did not have enough information or
visibility because there were hundreds of distributors across a geographically large country.  To
the contrary, Skullcandy's problems existed at one distributor, which was the Company's largest
and most important distributor in China.  The Company knew how important this distributor was,
and senior officers were aware (or were severely reckless in not being aware) of the state of
business with this vital distributor.  Accordingly, it would not have been difficult for Defendants
to obtain crucial and relevant information regarding a central aspect of the Company's business
prospects. To the contrary, this information was very easy to monitor, and could have been
obtained with one phone call or email.

125.     *The Company boasted about very sophisticated and comprehensive information*
*management systems that would have informed them of any issues with its main Chinese*
*distributor.*  Specifically, Skullcandy maintains sophisticated software systems that allow the
Company to manage purchasing, inventory tracking, financial information, and retail, distributor
and direct order fulfillment.  As discussed in the Company's 2014 Form 10-K, filed on March
13, 2015, the Company uses a sophisticated management information system called "SAP
Business ByDesign," which provides a full range of forecasting, financial reporting, and
inventory management, among other systems.   SAP Business ByDesign performs various
functions that support financials, human resources, sales, procurement, customer service, and
supply chain management.  Former Skullcandy employees stated that through SAP Business
ByDesign, the Company "can better manage [] time, information, accounts, inventory,

everything we have as we grow."[36]  A former Skullcandy Warehousing & Logistics Manager, FE 3, confirmed that Skullcandy's sales—both domestically and internationally—were reported and tracked through the company's ERP system, SAP ByDesign.  FE 3 said that Chinese sales orders and revenues were also integrated onto SAP ByDesign system.

126.    Further, Skullcandy's software systems are integrated with its third-party logistics warehouses that manage inventory and fulfillment activities worldwide.[37]  So when a particular product is not selling, or when inventory is backing up, Defendants know it immediately.  The sophisticated software system not only allowed the Company to track performance, sale, and inventory levels but also allowed Defendants to forecast revenue and earnings with remarkable precision.  It became the Company's practice, a few weeks into the quarter, to provide analysts with revenue and earnings guidance for the balance of the quarter.  Collectively, the various information systems in place at Skullcandy during the Class Period allowed Defendants to see where and to what extent inventory was backing up and issues related to collectability of receivables.

127.    *Former employees confirm that the Company closely tracked sales and knew sales in China were poor.  See e.g.* ¶¶33, 45-49, 51.  As described above by Skullcandy's former employees, sales in China "weren't gaining traction within the market" and as a result, the Company's main distributor had significant amounts of unsold product stored in its warehouses and "could not sell goods in the third year so the China market was not good."  ¶¶45, 47.

128.    In addition to confirming the significant inventory overhang, the Individual Defendants directly participated in meetings and in the setting and reporting of Skullcandy's

---

[36] http://www.sap.com/customer-testimonials/high-tech/skullcandy.html

[37] Also during 2012, the Company transitioned the inventory from its own third party warehouse in Shenzhen, China to a third party logistics facility in Yantian, China, in order to further reduce costs and facilitate order fulfillment to international retailers.

financials and guidance.  As described by a former Skullcandy Sales Manager, FE 5,[38] Defendants participated in the guidance process at Company meetings.  Once a year in November, there was a forecasting meeting at Skullcandy, FE 5 said.  She added that  "[i]n the planning session for the upcoming year, everyone domestic and international is supposed to get details from the accounts they work, and it's supposed to be down to the SKU level."  FE 5 added that "[t]here were quarterly opportunities to revise your number; those were always before shareholder calls," and that "[i]n that regard, there were always opportunities to correct or fix any mistake you made in forecasting in [the] beginning."

129.    In addition, Skullcandy's senior management held weekly calls with all domestic and international sales reps to see where they were trending with the numbers.  These sessions were referred to internally with the acronym, "STU."  The calls were routinely presided over by the Vice President of Sales.  Frequently, Defendant Darling would also be present and lead the calls, while Defendant Hodell also participated in all the calls, FE 5 relayed.  In regards to the calls, FE 5 added: "Whenever you're short the forecast or whenever you're not trending in the proper manner, you'd have to defend why you're off or tell them how you would recoup the loss."  There were at least six to eight domestic sales reps on the calls.  The director of each global territory would also participate.  "There was representation from each sales channel – domestic and international," FE 5 said.  "What I can tell is those STU calls are financing forecasting calls and that Hodell was on every one of them and so was either the VP of Sales or the Chief Sales Officer," FE 5 added.

---

[38] From 2011 through July 2015, FE 5 worked in marketing and sales and was responsible for the Company's wireless channel.  She also worked with product management and marketing supply chain.

130.   FE 5 learned during the weekly calls that China was performing below par through at least July 2015, when she left Skullcandy.  "I don't think China was ever great," she said.  "I remember that Asia/Pacific was never great."  By contrast, there was talk during the calls of robust sales in Latin America.

131.   Further, FE 6,[39] confirmed the Individual Defendants' hands-on role at the Company and described that "if there were (press) articles coming out, [Darling] would hold a company meeting and explain, 'Here's what's being said,' and 'Here's what's going on.'"  According to FE 6, Darling also held a company-wide meeting in January 2016 to discuss Q4 and year-end results, either a few days before or a few days after reporting to *The Street*.  Darling disclosed that "we've had headwinds in China; we have issues in China."  During the meeting, Darling mentioned "unsold product" in China, FE 6 said.  Darling presented the numbers. "He showed, 'Here's our Europe did.  They had some good growth.  Here's how the U.S. did; less growth but still a little bit.'  Then, China, like a massive drop.  I remember it was like a significant double-digit drop," FE 6 said.  FE 6 recollected that China had fallen off by at least 30 percent.

132.   *The Company's own statements establish the considerable length and duration of the problems existing at Skullcandy, which support a finding of scienter.*  Skullcandy's  insiders knew of or recklessly disregarded that Skullcandy's Chinese market was facing significant challenges due to decreased customer demand and that distributors were hoarding product in warehouses as early as May 2015.  In a May 15, 2015 industry roundtable discussion in

---

[39] FE 6 worked at Skullcandy headquarters from October 2014 until August 2016.  From October 2014 through September 2015, she was a Social Media Coordinator, responsible for conceptualizing, strategizing and implementing all social initiatives.  From September 2015 through August 2016, she was a Content Specialist.  FE 6 collaborated with key team members from all marketing groups to develop consistent content streams and received company-wide recognition during her tenure at the Company.

Shanghai, Director of Marketing and Communications at Skullcandy in China, Vivian Tu, revealed that "consumers who are really into headphone performance are not buying Skullcandy" and that sales for the Company's products were not "<u>sustainable</u>." Thus, Defendants knew or recklessly disregarded that its vital international region did not have the sales growth and potential as claimed.

133.     In November 2015, Defendants stated that distributor issues in China would affect Skullcandy's financial results.  Yet, Defendants characterized these issues as mere "growing pains."  In January 2016, Defendants came clean, stating that there were "challenges with a China distributor;" that "clean-up work" was necessary; and that a $1.6 million pre-tax charge for bad debt was required.  However, the fallout continued.  In March 2016, Defendant Darling noted the "significant impact" of the $1.6 million debt charge and "headwinds" and "challenges around payment and maximizing the territory" in China.  Darling explained that the Company's "wholesale business in China declined during the fourth quarter and we withheld shipments to Timesrunner, our distributor that sells into the brick and mortar CE channel."  As late as August 2016, the Company was still disclosing poor sales in China and significant problems with its distribution channel, further underscoring the lack of a reasonable basis for Defendants' statements downplaying the severity of the problems plaguing the Company's operations.  The Company's problems with China sales existed for almost a year after the Company first acknowledged them, and ultimately resulted in Skullcandy's failure as a public company.

134.     *Insider selling is highly indicative of scienter*.  Defendant Alden was motivated to perpetuate the fraudulent scheme alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales that were highly suspicious in both amount and timing.  Specifically, between September 8, 2015 and January 7, 2016, and while in

possession of material, nonpublic information regarding Skullcandy's business, Alden and the Alden Family Trust sold or otherwise disposed of **889,500 shares** of the Company's common stock at artificially inflated prices, reaping insider trading proceeds of over ***$4.5 million***.

135.   During the Class Period, Alden sold 100,000 shares of Skullcandy for proceeds of over $530,000, while the Alden Family Trust sold 675,000 shares for proceeds of nearly $3.5 million.  Combined, Alden and his Trust sold 775,000 shares for proceeds of over $4 million.  In addition, in what was originally mistakenly reported as an open market sale, the Alden Family Trust "gifted" 114,500 shares of Skullcandy common stock to the Holly Alden Family Foundation on November 25, 2015.  This gift was valued at nearly $500,000.

136.   Defendants Rick Alden and Ptarmagin, LLC's stock transactions during the Class Period are as follows:

## Skullcandy Insider Sales

| Date | Entity | Relation | Shares | Price | Proceeds |
|------|--------|----------|--------|-------|----------|
| 09/08/15 | Alden, Rick | Director | 25,000 | $6.79 | $169,750 |
| 10/13/15 | Alden, Rick | Director | 25,000 | $5.73 | $143,250 |
| 11/10/15 | Alden, Rick | Director | 25,000 | $4.62 | $115,500 |
| 12/08/15 | Alden, Rick | Director | 25,000 | $4.15 | $103,750 |
| **Total Alden** | | | 100,000 | | **$532,250** |
| | | | | | |
| 09/10/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $6.59 | $247,125 |
| 09/17/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $6.46 | $242,250 |
| 09/24/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $6.19 | $232,125 |
| 10/01/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $5.55 | $208,125 |
| 10/08/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $5.84 | $219,000 |
| 10/15/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $5.63 | $211,125 |
| 10/22/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $5.67 | $212,625 |
| 10/29/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $5.63 | $211,125 |
| 11/05/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $6.14 | $230,250 |
| 11/12/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.34 | $162,750 |
| 11/19/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.26 | $159,750 |
| 11/27/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.14 | $155,250 |
| 12/03/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.25 | $159,375 |
| 12/10/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.14 | $155,250 |
| 12/17/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.43 | $166,125 |
| 12/24/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.58 | $171,750 |
| 12/31/15 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.73 | $177,375 |
| 01/07/16 | Ptarmagin, LLC | 10% Owner | 37,500 | $4.56 | $171,000 |
| **Total Ptarmagin** | | 675,000 | | | **$3,492,375** |
| **Total Combined** | | 775,000 | | | **$4,024,625** |

137.  These insider transactions were unusual compared to Alden's trading history as they represented Alden's first sale in nearly three years since October 2012, and the Alden

Family Trust's first sale since March 2014.[40]  In other words, prior to September 8, 2015, Alden

had sold zero shares in the previous three years and his Trust had sold zero shares in the previous

year and a half.

138.   While Defendant Alden's Class Period selling was purportedly effectuated

through 10b5-1 trading plans,[41] even a cursory review of his use of these plans raises significant

red flags and suspicion that the proper purpose of these plans was subverted.  An examination of

Alden's trading plans and trading activities raised a number of the red flags commonly applied

by corporate law firms, the Securities and Exchange Commission, the Council for Institutional

Investors and academic research.[42]  Common red flags for abusing trading plans that were

evident in Alden's insider sales include the following:

---

[40] In a suspiciously well-timed sale, the Alden Family Trust sold 1.5 million Skullcandy shares in just a 3-day period from March 12 through March 14, 2014, at prices as high as $9.69 per share. These sales were not pursuant to a trading plan and occurred days after a large spike in Skullcandy's stock price.  Less than two months later, Skullcandy's stock price was nearly 30% lower closing at $6.86 per share on May 8, 2014.

[41] In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans").  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential defense to accusations of insider trading only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.  With regard to such trading plans, a December 13, 2012 Wall Street Journal article entitled "SEC Draws Fire Over Executive Trading Plans," notes "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior."  According to one source cited in the article, "[c]ompanies are using these plans as a tool . . . that allows executives to do insider trading."

[42] The Council of Institutional Investors ("CII"), a nonprofit, nonpartisan association of public, corporate and union pension funds contacted the SEC on various occasions regarding its concerns with misuse of trading plans. *See* Letter from Jeff Mahoney, General Counsel, CII, to The Honorable Elisse B. Walter, Chairman, U.S. Securities and Exchange Commission (Dec. 28, 2012),,http://www.cii.org/files/issues_and_advocacy/correspondence/2012/12_28_12_cii_letter_to_sec_rule%20_10b5-1_trading_plans.pdf ("Companies and company insiders should be prohibited from adopting multiple, overlapping Rule 10b5-1 plans").

- Abnormal stock divestment;

- The use of multiple, overlapping plans; and

- Irregular, inconsistent and asymmetrical disclosures, including a lack of Class Period disclosures.[43]

139. During the Class Period, Alden effectively operated two separate trading plans. Alden's overlapping plans were highly unusual and suspicious and were utilized contrary to the intended purpose of having these plans.[44]   On June 5, 2015, one-month after announcing first quarter 2015 financial results, Alden established two 10b5-1 trading plans whereby Alden would sell 25,000 shares monthly beginning on September 8, 2015 and his irrevocable trust would sell 37,500 shares weekly beginning on September 10, 2015.[45]   Notably, Alden had last established trading plans in September 2012 whereby Alden only sold 16,000 Skullcandy shares and the Alden Family Trust sold only 78,000 shares.   The newly-established plans dwarfed previous plans as they allowed Alden to sell up to 300,000 Skullcandy shares and the Alden Family Trust to sell up to 1,987,500 shares (19 and 25 times more shares than the previous plans, respectively).

---

[43] A well-known defense counsel firm has acknowledged the importance of "public disclosure of the plan in advance of or at the time that it is established," *See The Spotlight Shines on Rule 10b5-1 Plans: What Public Companies Should Consider Now* (Gibson Dunn Jan. 22, 2013), *available at*: http://www.gibsondunn.com/publications/Pages/Spotlight-Shines-Rule10b5-1Plans-What-PublicCompanies-ShouldConsider.aspx

[44] A Wall Street Journal investigation found that insiders who were trading pursuant to 10b5-1 plans were still trading at opportune times and reaping better-than-expected results.   According to Wall Street Journal article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

[45] While established on June 5, 2015, the plans were not announced until September 8, 2015, when Skullcandy filed with the SEC a Form 8-K.

140.    In addition, the timing of the plan sales were very suspicious as the sales were being sold-off in an apparent rushed fashion of a weekly basis in Alden's Family Trust plan and the sales occurred prior to materially negative disclosures.

141.    While Defendant Rick Alden and Ptarmagin, LLC's stock sales were made pursuant to 10b5-1 plans, the circumstances of those sales are sufficiently suspicious to overwhelm any inference that they were made in good faith.  Approximately one month after the Company unexpectedly raised guidance, Alden and Ptarmagin began disposing their shares through prearranged stock trading plans established on June 5, 2015.  Between September 8, 2015, and January 7, 2016, Alden and Ptarmagin sold 775,000 beneficially owned Skullcandy shares into the open market for proceeds of over $4 million.  In this circumstance, even trades according to a 10b5-1 plan are highly suspicious and indicative of insider trading behavior.

## X.    LOSS CAUSATION

142.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  Throughout the Class Period, the price of Skullcandy's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above, and Lead Plaintiffs and the Class purchased the Company's common stock at artificially inflated prices during the Class Period.

143.    Defendants' disclosures on November 5, 2015 and January 11, 2016 revealed to the market on a piecemeal basis the false, misleading and fraudulent nature of Defendants' statements and omissions, and the extent of the misrepresentations contained in Skullcandy's financial statements that form the primary basis of this action.  When the truth concerning the Company was revealed to the market, the price of Skullcandy common stock declined in

response, as the artificial inflation caused by the Company's and the Individual Defendants' material omissions and false and misleading statements was removed from the price of Skullcandy common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

144.    Indeed, during the Class Period, Skullcandy common stock traded as high as $11.12 per share on May 5, 2015, and closed at $6.34 on November 5, 2015, the day before Skullcandy's press release when the first partial disclosure of the Company's true condition was revealed.  The Company and the Officer Defendants mitigated the impact of this disclosure and prevented the full truth about Skullcandy from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market.  As the market finally learned the magnitude of the Company's issues and the implications for Skullcandy's financial condition, the price of the Company's common stock plummeted an additional $1.29 per share to close at $3.26 per share on January 12, 2016.

145.    It was entirely foreseeable to the Individual Defendants that concealing Skullcandy's problematic operations would artificially inflate the price of the Company's common stock.  It was similarly foreseeable to the Individual Defendants that the revelation of that misconduct and Skullcandy's true financial condition would cause the price of the Company's common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected.  Accordingly, the conduct of Skullcandy and the Individual Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class.

## XI.    PRESUMPTION OF RELIANCE

146.    At all relevant times, the market for Skullcandy securities was efficient for the following reasons, among others:

      a.    Skullcandy's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      b.    As a regulated issuer, Skullcandy filed periodic reports with the SEC and the NASDAQ;

      c.    Skullcandy regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.    Skullcandy was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

147.    As a result of the foregoing, the market for Skullcandy securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Skullcandy securities.  All purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Skullcandy securities at artificially inflated prices, and a presumption of reliance applies.

148.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Skullcandy's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in

making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

149.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

150.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Skullcandy and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer and/or director of Skullcandy who knew that such statement was false when made.

## XIII.   CLASS ACTION ALLEGATIONS

151.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the securities of Skullcandy between May 5, 2015 and January 11, 2016, inclusive (the "Class"), and

who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Skullcandy at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

152.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Skullcandy shares were actively traded on the NASDAQ Global Market ("NASDAQ") (an open and efficient market) under the symbol "SKUL."  Millions of Skullcandy shares were traded publicly during the Class Period on the NASDAQ.  As of October 31, 2015, there were 28,530,493 shares of Skullcandy common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class.  Class members who purchased Skullcandy securities may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

153.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

154.    Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

155.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

      a.     whether the federal securities laws were violated by Defendants' acts, as alleged herein;

      b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

      c.     whether Defendants acted with scienter; and

      d.     the proper way to measure damages.

156.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act,
And SEC Rule 10b-5 Promulgated Thereunder
(Against Defendants Skullcandy, Darling, Hodell and Alden)**

157.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

158.     This Count is asserted on behalf of all members of the Class against Defendants Skullcandy, Darling, Hodell and Alden for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

159.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

160.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Skullcandy securities during the Class Period.

161.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Skullcandy securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Skullcandy's Chinese operations, FY 2015 outlook, and the Company's financial statements; (b) artificially inflate and maintain the

market price of Skullcandy securities; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's securities at artificially inflated prices, and to suffer losses when the true facts became known.

162.   Defendants Skullcandy, Darling, Hodell and Alden are liable for all materially false and misleading statements made during the Class Period, as alleged above.

163.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Skullcandy securities, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

164.   Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Skullcandy securities, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the other members of the Class would not have purchased Skullcandy securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

165.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Skullcandy securities during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Darling, Hodell and Alden)

166.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

167.    This Count is asserted on behalf of all members of the Class against Defendants Darling, Hodell and Alden for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

168.    During their tenures as officers and/or directors of Skullcandy, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶21-23.  By reason of their positions of control and authority as officers and/or directors of Skullcandy, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Skullcandy during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

169.    In their capacities as senior corporate officers and/or directors of the Company, and as more fully described above in ¶¶21-23, Defendants Darling, Hodell and Alden had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  Defendants Darling and Hodell signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements

disseminated by Skullcandy during the Class Period.  Defendants Darling and Hodell were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Darling and Hodell during the Class Period.  As a result of the foregoing, Defendants Darling, Hodell and Alden, as a group and individually, were controlling persons of Skullcandy within the meaning of Section 20(a) of the Exchange Act.

170.   As set forth above, Skullcandy violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

171.   By virtue of their positions as controlling persons of Skullcandy, and as a result of their own aforementioned conduct, Defendants Darling, Hodell and Alden are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired Skullcandy securities.  As detailed above in ¶¶21-23, during the respective times these Defendants served as officers and/or directors of Skullcandy, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

172.   As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Skullcandy securities.

## XV.    <u>PRAYER FOR RELIEF</u>

173.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.      Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.      Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.      Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## XVI.   <u>JURY DEMAND</u>

174.    Lead Plaintiffs hereby demand a trial by jury.

DATED: May 8, 2017              Respectfully Submitted,

**COHNE KINGHORN, P.C.**
Jeffrey L. Silvestrini, Esq.
257 East 200 South Suite 700
Salt Lake City, UT 84111
Telephone: (801) 363-4300

*Liaison Counsel for Co-Lead Plaintiffs*

**SAXENA WHITE P.A.**
Steven B. Singer
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
Email: ssinger@saxenawhite.com

-and-

Joseph E. White, III
Lester R. Hooker
Jorge A. Amador
Dianne M. Anderson
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile:  (561) 394-3082
jwhite@saxenawhite.com
lhooker@saxenawhite.com

64

danderson@saxenawhite.com

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Dr., Suite 3112
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile:  (484) 631-1305
rmaniskas@rmclasslaw.com

*Lead Counsel for Co-Lead Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on May 8, 2017, I filed the foregoing in the U.S. District Court for

the District of Utah through the Court's CM/ECF system. All parties were served electronically.


*/s/ Jeffrey L. Silvestrini*
*Jeffrey L. Silvestrini*