# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| MELANIE DAVIS, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SKULLCANDY, INC., SETH DARLING, JASON HODELL, and RICHARD P. ALDEN,<br><br>　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:16-cv-00121-RJS-PMW<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Paul M. Warner |

　　　This case stems from a shareholder dispute at Skullcandy, Inc. Plaintiff is a shareholder who alleges that Skullcandy; its CEO, Seth Darling; its CFO, Jason Hodell; and a board member and major shareholder, Richard Alden (collectively, Defendants) committed securities fraud by misleading shareholders about the company's performance. Skullcandy filed a Motion to Dismiss,[1] arguing the Complaint does not allege facts that would give rise to a securities violation. For the reasons explained below, Skullcandy's Motion is GRANTED.

## BACKGROUND

　　　Skullcandy is a designer, marketer, and distributor of audio equipment. Starting in the first quarter of 2015, the company began announcing strong sales growth. On May 5, 2015, Skullcandy issued a press release announcing growth of 18 percent on a year-over-year basis, which it partially attributed to "increased sales in China."[2] Hodell stated on an earnings conference call that Skullcandy's international net sales increase "was primarily due to strong

---

[1] Dkt. 47.

[2] Dkt. 41 at 2–3.

gains in China."[3] Darling also cited "strong gains" in China, stating that "[o]f all our regions, China grew at the fastest pace in the first quarter, up 36% year-over-year."[4] The company's growth continued throughout the second quarter of 2015, and Skullcandy again released a statement partially attributing the growth to increased sales in China. Skullcandy's executives also commented on the growth, with Darling noting "strong growth performance" in China and Hodell again stating that the increase in international net sales "was primarily due to strong gains in . . . China."[5]

Skullcandy's stock price increased with this news. But Plaintiff alleges shareholders were misled about the growth in China, pointing to statements by six former Skullcandy employees that Plaintiff contends support an inference that the sales in China were not legitimate.

According to Plaintiff, Former Employee 1, a global demand planning manager who left Skullcandy in May 2015, stated the company's international goals were "aggressive" and that an eventual precipitous drop in share price was "a red flag because no one was paying attention."[6] Former Employee 2, an area sales supervisor who worked at Skullcandy in Shanghai until May 2015, stated that the company prodded Timesrunner—Skullcandy's largest distributor in China—to purchase its products even though Timesrunner was unable to sell the products to customers.[7] Former Employee 2 also stated that Timesrunner "could not sell goods in [2015]," so the China market was "not good."[8] Former Employee 3, a warehouse and logistics manager

---

[3] *Id.* at 15.

[4] *Id.*

[5] *Id.* at 15–16.

[6] *Id.* at 14, 19.

[7] *Id.* at 18.

[8] *Id.*

2

in Utah, stated that sales in China "seemed like they were pretty flat" and that Skullcandy was not "gaining traction within the market."[9] Former Employee 4, who worked as an email marketing and database manager, stated that Skullcandy "never tried to do anything with the China market in 2015" in terms of a digital effort.[10] Former Employee 5, who worked in marketing and sales through July 2015, described weekly internal sales calls in which Darling and Hodell would hear reports of sales from each of the company's territories.[11] This employee stated that during these calls, the report from China was "never great."[12] Finally, Former Employee 6, who worked as a social media coordinator and content specialist, discussed Darling's role in explaining press releases at company meetings.[13]

Plaintiff argue that, taken together, the former employees' accounts support an inference that, in an attempt to inflate sales numbers, Skullcandy engaged in a "channel-stuffing" scheme, in which it sent extra inventory to Timesrunner, even though it knew the market in China was poor and that Timesrunner would not be able to sell the product. Plaintiff also alleges Defendants knew of or recklessly disregarded this scheme. Plaintiff alleges China was a critical region for Skullcandy and that Timesrunner was its only large distributor, so Defendants could easily track Skullcandy's inventory with its sophisticated information management system. Additionally, Plaintiff alleges that Darling and Hodell's participation in the weekly internal sales calls would have alerted them that the poor state of the market in China meant they would not be able to sell the extra inventory.

---

[9] *Id.*

[10] *Id.* at 20.

[11] *Id.* at 47–48.

[12] *Id.*

[13] *Id.*

Although Alden is not alleged to have participated in the weekly sales calls, Plaintiff contends he still knew of or recklessly disregarded this channel-stuffing scheme. As evidence of his scienter, Plaintiff points to Alden's sales of Skullcandy stock. Alden, along with Ptarmagin—an LLC whose only member is an Alden family trust—made trades through 10b5-1 automatic trading plans established on June 5, 2015.[14] Between May 5, 2015 and January 11, 2016, Alden and Ptarmagin sold 775,000 shares of Skullcandy stock for over $4 million.[15] Alden's family trust also gifted 114,500 shares of Skullcandy common stock—worth almost $500,000—to the Holly Alden Family Foundation in November 2015.[16] These transactions were Alden's first stock sale in almost three years, and Ptarmagin's first sale in a year and a half.[17]

Plaintiff alleges the fraudulent scheme started to unravel when Skullcandy announced third-quarter results that were lower than expected and the stock price fell 24 percent.[18] However, Defendants continued to tout sales opportunities in China. On November 5, 2015, Skullcandy issued a press release stating international sales grew "primarily due to increased audio product sales in . . . China."[19] On an earnings call that same day, Darling stated the lower financial results merely reflected "growing pains" and that China was still a "huge opportunity for the brand long-term."[20] Two weeks later, Skullcandy discussed its "temporary slowdown in China" and stated it would "transition[] to improved distribution platforms."[21]

---

[14] *Id.* at 10, 51–53.

[15] *Id.* at 50.

[16] *Id.*

[17] *Id.* at 51–52.

[18] *Id.* at 4.

[19] *Id.* at 34.

[20] *Id.* at 35.

[21] *Id.* at 36.

On January 11, 2016, the company announced it had missed its fourth-quarter 2015 projections and cut its earnings guidance nearly in half. Skullcandy also announced it was taking a $1.6 million pre-tax charge for bad debt due to "challenges with a China distributor" and "clean-up work with our largest China distributor."[22] Skullcandy's stock fell 28 percent with this news, and its sales in China continued to decline throughout 2016. During an earnings call in March 2016, Darling stated that Skullcandy's "wholesale business in China declined during the fourth quarter, as we withheld shipments to Timesrunner, our distributor that sells into the brick and mortar CE channel."[23] As late as August 2016, Skullcandy was attributing a decrease in international sales to "significantly decreased sales in China."[24]

Plaintiff filed this suit, alleging that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act. Defendants filed a Motion to Dismiss,[25] arguing neither the company nor the individual Defendants made materially misleading statements and that Plaintiff has not alleged sufficient facts to meet the scienter requirement for pleading securities violations.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires a plaintiff to "state a claim upon which relief can be granted." To do so, a complaint must allege sufficient facts to make the claims for relief plausible on their face.[26] In reviewing a motion to dismiss, the court accepts "the well-pleaded allegations of the complaint as true" and construes them "in the light most favorable to the plaintiff."[27]

---

[22] *Id.* at 22, 25.

[23] *Id.* at 6.

[24] *Id.*

[25] Dkt. 47.

[26] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

[27] *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) (citation omitted).

A claim for fraud must "state with particularity the circumstances constituting fraud or mistake."[28] This requires a plaintiff to "set forth the who, what, when, where and how of the alleged fraud" and describe "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[29]

A plaintiff alleging securities fraud must also meet the rigorous pleading requirements of the Private Securities Litigation Reform Act (PSLRA). The complaint must "specify each statement alleged to have been misleading" as well as "the reason or reasons why the statement is misleading."[30] The plaintiff must also meet a "more stringent rule for pleading scienter" by stating "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[31] An inference of scienter is "strong" under the PSLRA if it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[32]

## ANALYSIS

Plaintiff alleges Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act. The court will address each Section in turn.

### I. Section 10(b)

Plaintiff alleges Defendants knowingly or recklessly violated Section 10(b) by making false or misleading statements of material fact regarding Skullcandy's sales and opportunities in China.

---

[28] Fed. R. Civ. P. 9(b).

[29] *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726–27 (10th Cir. 2006) (citations omitted).

[30] 15 U.S.C. § 78u–4(b)(1).

[31] *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095–96 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003) (quoting 15 U.S.C. § 78u–4(b)(2)).

[32] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

A claim for securities fraud under Section 10(b) has five elements: "(1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance."[33] Plaintiff alleges Defendants knowingly or recklessly made false or misleading statements and omissions about both past sales and future growth opportunities in China.

### A. False or misleading statements

Plaintiff's allegations of false and misleading statements center on the existence of a channel-stuffing scheme. The statements regarding past sales were false, Plaintiff contends, because Skullcandy sent extra inventory to Timesrunner that it knew the distributor could not sell. According to the Complaint, Skullcandy then improperly recorded those shipments to Timesrunner as sales that it touted in its public statements and SEC filings, knowing or recklessly ignoring that the inventory would eventually have to be returned. Plaintiff alleges Timesrunner returned the extra inventory to Skullcandy in 2016 and reversed the sales it had listed, resulting in Skullcandy's $1.6 million pre-tax charge for bad debt.

According to the Complaint, the alleged channel-stuffing scheme also formed the basis for false forward-looking statements. Plaintiff alleges Darling and Hodell repeatedly touted the China market as "a huge opportunity for the brand" when in fact it was performing poorly, and that Skullcandy issued earnings guidance reports containing inflated projections. Taking these

---

[33] *Adams*, 340 F.3d at 1095.

allegations as true for purposes of this Motion, the court concludes Plaintiff has adequately alleged false or misleading statements from Darling, Hodell, and the company.

However, Plaintiff has not pointed to a specific false or misleading statement by Alden. Plaintiff's allegations with respect to Alden rest solely on his trading plan and on the theory of "group pleading," in which Plaintiff urges the court to impute the company's statements to the individual Defendants. Neither the Supreme Court nor the Tenth Circuit has decided whether the group pleading theory survives the heightened pleading standard of the PSLRA. However, other circuits have routinely rejected the doctrine in securities fraud cases.[34] In any case, the court need not reach the issue of whether group pleading is applicable to impute false statements to Alden because Plaintiff has not adequately alleged he acted with scienter.

**B. Scienter**

Plaintiff alleges Defendants made false and misleading statements with knowledge or recklessness. As support, Plaintiff cites a former Skullcandy employee's statement that the company prodded Timesrunner to take extra inventory that the distributor could not sell, that Skullcandy had a sophisticated inventory tracking system that should have alerted the company about excess inventory, and that during the weekly sales calls, which often included Darling and Hodell, the report of sales from China was "never great." Additionally, Plaintiff alleges that at least by November 2015, Defendants were aware of problems regarding inventory and lack of growth in China because Skullcandy issued statements about the "growing pains" the company was experiencing as a result. Plaintiff also notes that only two months passed between

---

[34] *See Winer Family Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) ("[T]he group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("The 'group pleading' doctrine conflicts with the scienter requirement of the PSLRA . . . .").

8

Defendants' positive statements about growth in November 2015 and the announcement in January 2016 of dramatically lower results. Plaintiff maintains this short time period, combined with the magnitude of the earnings miss, indicates that Defendants knew how serious the problems were before the January 2016 announcement. Plaintiff urges the court to draw from these allegations the inference that Defendants knew or recklessly disregarded information that Timesrunner was overstuffed with inventory that it could not sell due to the poor state of the market and therefore any reported or forecasted sales growth in China did not represent the true state of affairs.

The Tenth Circuit addressed the sufficiency of similar claims in *Anderson v. Spirit Aerosystems Holdings, Inc.*, in which plaintiff shareholders of Spirit AeroSystems alleged the company's executives misrepresented and failed to disclose cost overruns and production delays for three projects relating to aircraft production.[35] The plaintiffs in that case asserted many of the same types of bases for scienter as are present here, including reports from corroborating witnesses, the status of the projects as part of the company's "core operations," disclosures of risk, accounting violations, and the magnitude of the loss.[36]

In alleging scienter based on corroborating witnesses' accounts, the plaintiffs in *Anderson* provided ten witness accounts of "generalized descriptions of internal meetings, cost reports, delays, and mismanagement."[37]

The Tenth Circuit declined to infer scienter on this basis, noting that the witness accounts did not describe the executives actually receiving some of the identified reports about the projects' losses, and did not adequately describe the contents of the reports the executives did

---

[35] 827 F.3d 1229, 1235–36 (10th Cir. 2016).

[36] *Id.* at 1238.

[37] *Id.* at 1239.

9

receive.[38] For example, one witness referred to a report stating that Spirit could not meet its cost-reduction goals and that the business group had regularly reported losses on one of the projects.[39] But, the Tenth Circuit held, the four levels of management separating the witness from the CEO meant the allegations did not establish that the executives saw the same information the witness described.[40] The plaintiffs similarly failed to describe with particularity the contents of quarterly cost reports that were given to the executives. In addition to the difficulty of determining what information survived multiple layers of revisions through the chain of command, the court stated that one witness's account about procurement cost overruns suffered from a lack of context.[41] Thus, even assuming the executives received information about procurement costs, the witness did not address other factors, such as internal costs or total project costs, which were relevant to the executives' decisions.[42] Without that information, the Tenth Circuit could not draw an inference of scienter based on the witness's account.

Other witness accounts were too general to ascribe any scienter to the executives. The Tenth Circuit noted that "[o]nly one of the corroborating witnesses worked closely with any of the four Spirit executives, and this witness spoke only of general corporate mismanagement; the witness did not address whether the executives could have known that Spirit would be unable to meet long-term cost forecasts."[43] The other witnesses were "further removed" and thus "could not provide evidence bearing on the executives' mental states."[44]

---

[38] *Id.* at 1240.

[39] *Id.*

[40] *Id.* at 1241–43.

[41] *Id.* at 1243.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 1243–44.

10

The Tenth Circuit also rejected the plaintiffs' "core operations" argument. The plaintiffs claimed that because of the importance of the projects, the executives "personally monitored" the progress and thus "must have known that the projects would not meet long-run cost forecasts."[45] The Court held that, without more, it could not infer scienter "based only on a defendant's position in a company or involvement with a particular project," even when coupled with allegations that the executives were briefed on the cost data during meetings in which the projects were discussed.[46]

The Court also rejected the plaintiffs' other allegations of scienter related to disclosures of risk, accounting violations, and the magnitude of the loss, holding that the alleged facts amounted to mere corporate optimism, an "honest mistake," or "fraud by hindsight."[47] The Court concluded the plaintiffs' allegations could not support a cogent and compelling inference of fraud, even when considered together.

In this case, Plaintiff has presented weaker allegations than those the Tenth Circuit found insufficient in *Anderson*. First, Plaintiff's accounts of former employees suffer from even greater flaws than the witness accounts in *Anderson*. Plaintiff points to statements from six former employees, most of whom are not alleged to have worked closely with Defendants, and some of whom left the company before key events described in the Complaint transpired. Plaintiff has not alleged Defendants actually received reports about channel-stuffing or even inventory issues in general. And although Plaintiff alleges Defendants did receive some reports during the weekly sales calls, they do not describe the contents of those calls other than to say that China was "never great." Other former employees' statements that the market was "not

---

[45] *Id.* at 1245.

[46] *Id.*

[47] *Id.* at 1246–49.

11

good" and that sales seemed "pretty flat" are similarly generalized and do not describe with particularity what the Defendants knew or recklessly disregarded.

Second, like in *Anderson*, Plaintiff has provided no allegations in support of a "core operations" theory beyond the executives' positions in the company and their presence at meetings. Even assuming that China was an important market for Skullcandy, these allegations do not support a finding of scienter.

Finally, Plaintiff's allegations about the disclosure of risks, accounting violations, and magnitude of the loss are no more particularized than the allegations in *Anderson*. Plaintiff points to Defendants' November 2015 statements about "growing pains" in the China market as evidence that Defendants were aware of the discrepancies between their statements about strong sales growth and the actual state of the market. But the November 2015 statements are similar to the disclosures of risk in *Anderson*, which the court held "simply reflected an awareness of risks" rather than an inference of scienter.[48] Plaintiff's arguments about accounting violations and the magnitude and timing of the loss are also similar to the allegations in *Anderson*, which the Tenth Circuit rejected as "hindsight review."[49]

Even when considered as a whole, Plaintiff's allegations are too thin regarding channel-stuffing, which is the point on which the Complaint essentially rises and falls. The only allegation directly in support of a channel-stuffing scheme is that of a former employee who left the company in May 2015—which Plaintiff alleges was the start date of the scheme—stating that Skullcandy prodded Timesrunner to take more inventory than it could sell. But Plaintiff does not allege that Timesrunner actually agreed to take the excess inventory, that excess inventory was actually sent to Timesrunner, or that Timesrunner was ultimately unable to sell the product after

---

[48] *Id.* at 1250.

[49] *Id.* at 1251.

May 2015. Nor does Plaintiff allege the prodding to take inventory was the result of an agreement between Skullcandy and Timesrunner to stuff the channels while knowing or recklessly ignoring that the product would eventually have to be returned. And if there was such an agreement, Plaintiff does not allege who knew about or recklessly disregarded the plan, or how or when it was formed. Plaintiff need not allege all of these facts, but she must connect the dots between the sole statement about prodding Timesrunner and the conclusion that Skullcandy knowingly or recklessly engaged in a fraudulent channel-stuffing scheme during the relevant period. Otherwise, the allegations "may constitute 'a brushstroke' or two, but they fail to paint a 'portrait [that] satisfies the requirement for a strong inference of scienter under the PSLRA.'"[50]

Without more, the court cannot draw the inference that Skullcandy acted with scienter rather than merely misunderstanding the state of the market in China. The court thus concludes Plaintiff has not adequately alleged Defendants made false statements with knowledge or recklessness.

The court is aware that *Anderson* at times appears to read out of the statutory standard the option for plaintiffs to allege scienter through recklessness, instead focusing on whether the plaintiffs "provided a good reason to believe that the executives *knew* that the projects were unlikely to meet forecasts."[51] This gave rise to disagreement within the *Anderson* panel: the

---

[50] *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1347 (10th Cir. 2012) (alteration in original) (citation omitted)).

[51] *See Anderson*, 827 F.3d at 1246 (emphasis in original); *see also id.* at 1240 (stating that witness's account "does not establish the executives' knowledge"); *id.* at 1243 ("[T]he witness did not address whether the executives could have known that Spirit would be unable to meet long-term cost forecasts."); *id.* at 1245 (noting lack of evidence that executive "knew that his statements . . . were false or misleading"); *id.* at 1250 ("These warnings would not have suggested that the . . . projects were particularly important to Spirit executives or that Spirit executives knew that the risks on these programs were certain to result in a forward loss."); *id.* at 1251 (stating that argument about the magnitude of the loss "does not include particularized allegations that the four executives knew before October 2012

13

majority held the plaintiffs "did not provide sufficiently particularized accounts of what the Spirit executives must have known,"[52] but the concurrence argued that "[e]ven assuming [the defendants] failed to read those reports and did not have actual knowledge of the cost overruns, it would be an extreme departure from the standards of ordinary care to leave project reports unopened while simultaneously assuring investors that the projects were on plan."[53]

However, even where Plaintiff's theory in this case relies on recklessness, the allegations do not provide particularized accounts of Defendants' mental states. Thus, given the similarity of the facts alleged in *Anderson* and the current case, the court is bound by *Anderson*'s holding that allegations of generalized negative reports, disclosures of risks, and the size and timing of the loss are not sufficient to plead scienter under the heightened standard of the PSLRA. This is particularly so where this court construes the instant allegations to be weaker than those found insufficient in *Anderson*.

This holding is consistent with other Tenth Circuit cases. For example, in *Sanchez v. Crocs*, the Court held in an unpublished opinion that the existence of several red flags in an inventory system amounted at most to negligence where the plaintiffs did not "specifically identify the reports or statements [the defendant] had access to that contained these warning signs."[54] And in *In re Gold Resource Corp. Securities Litigation*, the Tenth Circuit held that a plaintiff's claim—a combination of accounting violations, allegations about the magnitude of the error, a "core operations" theory, and other circumstantial evidence—was "at best an assertion

---

that Spirit would lose money on the three projects"); *id.* ("[T]he plaintiffs do not identify particularized facts showing that the Spirit executives had known, before Spirit publicly announced the forward loss, that the three projects would fall behind forecasts on cost or production.").

[52] *Id.* at 1244.

[53] *Id.* at 1255.

[54] 667 F. App'x 710, 721 (10th Cir. 2016) (internal quotation marks omitted).

14

that defendants were negligent: it offer[ed] no particularized facts to support an inference" of scienter.[55]

Plaintiff's arguments about Defendants' forward-looking statements here suffer from the same deficiency, as they rely on allegations that Defendants knew of or recklessly disregarded the past struggles in the China market. In any case, *Anderson* forecloses a finding of scienter for forward-looking statements where the allegations are not specific enough to overcome the inference that the defendants were merely "overly optimistic and failed to give adequate weight to financial red flags."[56] Plaintiff has not provided particularized allegations about Defendants' mental states concerning the forward-looking statements, and thus have not met the PSLRA's pleading standard.

The Complaint contains even fewer particularized allegations of scienter relating specifically to Alden. Plaintiff argues the timing and magnitude of Alden's sale of Skullcandy stock, both individually and through Ptarmagin, supports an inference of scienter.

Where a defendant retains a substantial percentage of his holdings and the sales were made pursuant to an automatic trading plan, "[t]hese considerations rebut any inference of scienter [a court] might otherwise draw" regarding stock sales.[57] That is the case here: the transactions from May 5, 2015 to January 11, 2016 amounted to 10.4 percent of Alden's holdings and 13 percent of Ptarmagin's holdings, and the sales were made under 10b5-1 automatic trading plans.[58] The court concludes the timing and magnitude of Alden's sales are insufficient to show scienter under the PSLRA's heightened pleading standard.

---

[55] 776 F.3d 1103, 1116 (10th Cir. 2015).

[56] *Anderson*, 827 F.3d at 1238.

[57] *In re Level 3 Commc'ns*, 667 F.3d at 1346–47.

[58] Dkt. 47 at 28–29.

15

Finally, Plaintiff's claim against Skullcandy itself is based on the liability of its executives.[59] Because Plaintiff has not alleged scienter as to any of the individual Defendants, the claim against the company itself must also fail.

## II. Section 20(a)

Plaintiff also alleges the individual Defendants violated Section 20(a) of the Securities Exchange Act. Under Section 20(a), "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator."[60] In other words, a plaintiff must establish "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."[61]

Because Plaintiff has not alleged a primary violation of securities laws, they cannot show that the individual Defendants are liable as controllers of a primary violator. Thus, the Complaint does not allege an actionable Section 20(a) violation.

## CONCLUSION

Plaintiff has not alleged with particularity a violation of Section 10(b) or Section 20(a) of the Securities Exchange Act. Thus, Defendants' Motion to Dismiss is GRANTED.[62] The Complaint is dismissed without prejudice. However, if Plaintiff believes she is unable to plead stronger factual allegations in an amended Complaint, she may file a Rule 54(b) Motion asking the court to certify its judgment as final.[63]

---

[59] *See Adams*, 340 F.3d at 1106 ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority.").

[60] *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir. 1998) (citing 15 U.S.C. § 78t(a)).

[61] *Id.* at 1305.

[62] Dkt. 47.

[63] A motion for Rule 54(b) certification must show (1) the judgment is final and (2) there is no just cause for delay. *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir. 1988).

16

**SO ORDERED** this 21st day of March, 2018.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge